ATTORNEY FOR APPELLANT
Jacob P. Wahl
Jasper, IN

ATTORNEYS FOR APPELLEE
Curtis T. Hill
Attorney General of Indiana

Angela N. Sanchez
Supervising Deputy Attorney General
Indianapolis, IN

# In the
# Indiana Supreme Court



FILED
Feb 15 2018, 10:16 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

No. 87S00-1609-LW-497

MATHEW W. MCCALLISTER,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

Appeal from the Warrick Superior Court I, No. 87D01-1402-MR-74
The Honorable J. Zach Winsett, Judge

On Direct Appeal

**February 15, 2018**

**Slaughter, Justice.**

A Warrick County jury convicted Mathew McCallister of murder and conspiracy to commit murder, and he was sentenced to life imprisonment without parole. In this direct appeal, McCallister challenges (i) the sufficiency of the evidence supporting his convictions, (ii) various evidentiary rulings by the trial court, and (iii) the propriety of his sentence. We affirm the trial court's judgment.

**Factual and Procedural History**

We recite the facts most favorable to the judgment. During February 2014, Defendant, Mathew McCallister, lived with his girlfriend, Kelli Wyrick, in a series of hotels in Evansville, Indiana. Also living in Evansville hotels then were their friends Shawn Grigsby and Grigsby's girlfriend. The two couples would sometimes visit each other's rooms to use illegal drugs. On February 16, the couples were staying in adjoining rooms at a local Fairfield Inn, and they invited McCallister's sister, Jade Stigall; her fiancé, David Lackey; and McCallister's friend, Joseph Nelson; to join them at the hotel to smoke methamphetamine.

### A. Would you "like to play"?

At some point that evening, everyone left McCallister's room except Stigall and Nelson. After the two had smoked meth, Nelson inched closer to Stigall on the shared bed and asked if she would "like to play". Stigall considered Nelson's pitch to be an unwelcomed sexual advance. She sent her fiancé, Lackey, a text message explaining what had happened and asked him to return to the hotel. Lackey could not return immediately but told McCallister what had reportedly happened between his sister and Nelson. McCallister then called his sister to get her first-hand account. After hearing his sister's version, McCallister told Lackey and Grigsby to get Nelson out of the hotel and drive him to a local convenience store, where McCallister and Wyrick would meet them.

### B. "Start making amends"

After midnight on February 17, Grigsby and Lackey followed McCallister's instructions, and the two of them returned to the hotel. They picked up Stigall and Nelson and then left for the convenience store in a vehicle Stigall had borrowed. They met McCallister and Wyrick at the convenience store. McCallister got into the vehicle and directed Stigall, who was driving, to a rural area outside of Boonville in adjacent Warrick County. As they drove, McCallister, who was in the backseat with Nelson and Grigsby, told Nelson to "start making amends" with "which God or to which sort he believes in." McCallister asked Stigall to repeat what had happened, and she recounted that Nelson asked her whether she "wanted to play". Nelson tried to apologize, but Stigall told him to "shut the fuck up." McCallister also asked Grigsby "if he had … the clip", apparently referring to the magazine of Grigsby's automatic handgun, which Grigsby was showing off earlier that evening.

2

McCallister eventually directed Stigall to park near the Liberty Mine, a coal mine located in a remote area of Warrick County. The mine has open stock piles and provides coal via railroad car to the Alcoa Corporation plant in nearby Newburgh. McCallister left the vehicle first, followed by the other guys and then Stigall. McCallister and Grigsby walked alongside Nelson, with Stigall and Lackey walking a short distance behind. Stigall saw Grigsby give his gun to McCallister.

### C.    "Spark", "pop" and "flash"

As they walked, the men went around a corner and were momentarily out of Stigall's field of vision. When she turned the corner, she saw Nelson on his knees with McCallister and Grigsby standing behind him. She then saw a "spark go off from the gun" and "heard the pop and seen [sic] the flash" as McCallister shot Nelson in the back of the head. An obstructed view prevented Stigall from seeing the gun in McCallister's hand, but she saw McCallister's arm raised directly behind Nelson's head, observed the flash and heard the gunshot, and then watched McCallister's arm drop to his side as Nelson fell forward. As the group left the crime scene, they left Nelson's body behind.

Stigall drove the three men back to Evansville. En route, McCallister directed Stigall to drive to a specific location where he disposed of the gun and the ammunition down a sewer drain. Then they returned to the hotel. Almost immediately, McCallister and Lackey "started freaking out about something" and promptly left. Stigall did not hear from McCallister or Lackey again until Lackey called her later that morning at about 8:00 a.m. Stigall helped collect the clothes they had been wearing while with Nelson. Lackey and Stigall burned those clothes in a rural area.

Later that morning, Nelson's corpse was discovered in a coal-conveyor chute at the Alcoa plant. Video surveillance at Alcoa showed that the body arrived from the mine on a train car and had been emptied into the plant's coal-conveyor system earlier that day. An autopsy revealed that Nelson was killed by a single gunshot wound to the head—a so-called "contact" wound, meaning that when the shot was fired, the gun's barrel was either touching, or no more than a half-inch away from, the victim's head. The bullet entered Nelson's neck about half an inch behind his right ear and exited through his right eye. The bullet's trajectory was consistent with Stigall's account that Nelson was murdered execution-style. A toxicology test showed that Nelson's body contained alcohol, methamphetamine, amphetamines, and cannabinoids, the last of which indicated marijuana use. Coal dust was found on Nelson's body but not in his lungs.

3

A few days after police recovered Nelson's body, they obtained surveillance video from the Fairfield Inn. The video showed Nelson leaving the hotel with Grigsby, Stigall, and Lackey, prompting police to suspect the three knew something about Nelson's murder. Police already had information to support unrelated drug charges against Stigall and Lackey, so they brought charges and arrested them in hopes of persuading one of them to explain what happened to Nelson. Stigall not only gave detailed information about the murder, but also took police to the sewer drain where police recovered Grigsby's handgun and to the burn pile, where she had disposed of the clothes. For his part, Lackey showed police where the murder occurred. There they found rocks stained with Nelson's blood and a spent shell casing, which ballistics testing showed was fired from the recovered handgun.

### D.     Conviction and LWOP sentence

When McCallister went to trial in July 2016, Stigall had already pleaded guilty to assisting a criminal with murder. She testified that McCallister was the shooter. Grigsby, who by then had pleaded guilty to conspiracy to murder Nelson and received a twenty-year sentence, testified as a defense witness that he (Grigsby) had shot Nelson. After a six-day trial, the jury found McCallister guilty of murder and conspiracy to commit murder, a class A felony.

During the penalty phase, the jury found as an aggravating circumstance that McCallister committed the murder while on parole. The jury also determined this aggravating factor outweighed any mitigating circumstances, and it unanimously recommended a sentence of life without parole. The trial court imposed that sentence for murder and a concurrent forty-year term for conspiracy. McCallister now appeals his convictions and sentence.

### Discussion and Decision

### I.     McCallister's convictions were supported by sufficient evidence, and we decline to reweigh the evidence.

McCallister contends the evidence was insufficient to sustain either his murder or conspiracy convictions. For sufficiency challenges, we neither reweigh evidence nor judge witness credibility. Gibson v. State, 51 N.E.3d 204, 210 (Ind. 2016), reh'g denied. We consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn

4

from the evidence. Id. We will affirm the judgment if it is supported by substantial evidence, even if the evidence is conflicting. Id. On this record, we hold that the evidence supports McCallister's convictions, and that he fails to satisfy our stringent "incredible dubiosity" rule, according to which a reviewing court may substitute its judgment for that of the jury only where the evidence supporting the defendant's guilt is uncorroborated and so highly implausible as to be unreliable.

### A.    Conflicting evidence

In support of reversal, McCallister argues that the evidence supporting his convictions is "directly contradicted by other direct evidence". That is true but beside the point. There was indeed conflicting evidence about whether McCallister was the trigger man. And McCallister contends that Stigall, the sole witness who testified that he had shot Nelson, was not credible. But these arguments misapprehend our limited role as a reviewing court. We do not reweigh evidence or substitute our view of the evidence for that of the jury. Nor do we ask whether the jury might have reached a different result based on the evidence it heard. Our inquiry, rather, is whether record evidence supports the jury's verdict. Under that standard, the evidence is sufficient to support McCallister's convictions.

Stigall gave detailed testimony outlining what happened before, during, and after McCallister shot Nelson. As recounted above, after learning that Nelson had propositioned his sister, McCallister directed her and the others to take Nelson to a convenience store. Surveillance video corroborated that Nelson, Stigall, and the others left the hotel and met McCallister at the store. Next, she testified that McCallister got into her car at the store and directed her where to drive in rural Warrick County. While they drove, McCallister recommended that Nelson make peace with his God and asked Grigsby if he had the "clip" with him. After parking where McCallister had instructed her, everyone got out of the car, and Stigall saw McCallister put his hand on Nelson's shoulder as they left the vehicle. Stigall then saw Grigsby hand the gun to McCallister and, moments later, saw Nelson kneel on the ground in front of McCallister. McCallister's arm was extended in front of him at the back of Nelson's head. Then she saw a flash, heard a gunshot, and saw her brother's arm drop to his side as Nelson fell forward. Police later found Nelson's blood on the ground there, along with a shell casing from the gun McCallister used.

Stigall also testified she drove McCallister to dispose of the gun in a sewer drain. Only days later, she led police to that same location where they recovered the gun and ammunition. Ballistics testing confirmed the gun found in the sewer was the same gun that fired the shell casing found at the murder scene. Later, McCallister directed Lackey and Stigall to go to a rural site to burn the clothes they and the others had worn. Stigall eventually led police to the location of the burn pile. Items recovered there were too burned to be definitively connected to the crime, but they appeared to be items of clothing, including the sole of a shoe and metal rivets that could have come from a pair of jeans.

The jury was entitled to credit Stigall's testimony over conflicting evidence it heard. And this evidence is sufficient to prove McCallister's convictions for murder and conspiracy beyond a reasonable doubt.

### B.    Not "incredibly dubious"

Despite this evidence, McCallister asks us to reverse his convictions because, he argues, Stigall's testimony is incredibly dubious. Under our "incredible dubiosity" rule, we will invade the jury's province for judging witness credibility only in exceptionally rare circumstances. The evidence supporting the conviction must have been offered by a sole witness; the witness's testimony must have been coerced, equivocal, and wholly uncorroborated; it must have been "inherently improbable" or of dubious credibility; and there must have been no circumstantial evidence of the defendant's guilt. See Moore v. State, 27 N.E.3d 749, 755 (Ind. 2015). We decline to disturb the jury's verdict on this record because McCallister fails to establish this rare, limited exception applies here.

For three reasons, Stigall's testimony does not meet the requirements for applying our rule of incredible dubiosity. First, Stigall was not the sole testifying witness. Grigsby, another eyewitness to the crime, also testified. Although he differed with Stigall on several issues, including the shooter's identity, much of his testimony corroborated Stigall's account of that night. He acknowledged McCallister called him and told him to take Nelson from the hotel to the convenience store. He corroborated Stigall's testimony about the group leaving the hotel, meeting McCallister and Wyrick at the store, and then driving Lackey, McCallister, Grigsby, and Nelson to the location where Nelson was shot. Grigsby confirmed that during the drive to the murder

scene, there was discussion about Nelson's disrespectful behavior. And Grigsby confirmed his gun was the murder weapon.

Second, the events to which Stigall testified, including her fingering McCallister as the trigger man, are not inherently improbable, unimaginable, or otherwise outside the realm of human experience. Her narrative describing McCallister as the shooter is consistent with the theory that Nelson was killed as payback for disrespecting others and betraying their trust. As to the shooting itself, Stigall testified that as everyone was exiting the vehicle, she saw Grigsby hand the gun to McCallister; after they walked a short distance, she saw Nelson kneeling in front of McCallister; she then saw McCallister raise his arm; she heard a "pop" and saw a spark go off from the gun; and she saw Nelson fall forward. On direct examination, Stigall testified as follows:

Q:     Okay. And at that point in time who had the gun in their hands?

A:     Mat [McCallister].

Q:     And he was firing the weapon at Mr. Nelson; is that correct?

A:     Yes.

Q:     And you're sure that that's what you saw?

A:     Yes.

\*     \*     \*

Q:     And is it possible that you're mistaken?

A:     I don't believe I am, but we were all messed up on meth.

On cross-examination, Stigall clarified that she was about ten feet from McCallister during the shooting when she saw the "flash". When asked if she was sure McCallister was the shooter, she answered, "To my belief. What I believe is the truth of what I saw, yes." When asked if it was possible that Grigsby was the shooter, Stigall replied, "I don't believe it's possible. … I seen a flash, but I also seen my brother's arm up, and then it went down after the flash."

7

Third, a wealth of circumstantial evidence supports Stigall's account of the group's communications and whereabouts that evening. A recording of a phone conversation among Stigall, Grigsby, and McCallister supports her testimony that McCallister directed the group to lure Nelson out of the hotel. Surveillance footage from the Fairfield Inn shows members of the group leaving and later returning on a timeline consistent with Stigall's account. And Stigall later assisted officers by showing them the sewer drain where the group had disposed of the gun and the remote area in Warrick County where she and Lackey made the burn pile.

McCallister tries to discredit Stigall's testimony by pointing to her drug use, her lack of sleep, and contradictory testimony from other witnesses. He also argues that Stigall made inconsistent statements before trial concerning who shot Nelson, and that the prosecution dismissed some of Stigall's criminal charges, as if to suggest she gave perjured testimony against McCallister in exchange for favorable treatment from the State. But the jury was made aware of these supposed flaws with Stigall's testimony and elected to credit it nonetheless. Whatever ill effects Stigall may have experienced from using drugs and lacking sleep did not prevent her from communicating electronically with Lackey about Nelson's supposed advances in the hotel room, or following up with her brother by phone, or driving the group to the convenience store and then the crime scene, or collecting and burning the clothes, or afterward leading police to the burn pile and storm drain. In addition, Stigall denied making inconsistent statements before trial, and there was counter-evidence that dismissal of charges against Stigall was unrelated to the resolution of this case. It is noteworthy that there are many aspects of Stigall's testimony that McCallister does not challenge as incredible. His selective criticism is tantamount to a request that we reweigh the evidence. On this record, we decline to substitute our judgment for that of the jury.

As to conspiracy, McCallister argues that "[n]o witness ever testified that a conspiracy existed to kill Nelson." But this record contains ample evidence to allow the jury to infer all three elements of a conspiracy: intent to commit a felony, agreement with another person to commit the felony, and an overt act in furtherance of the agreement. See Perkins v. State, 483 N.E.2d 1379, 1385 (Ind. 1985). Perhaps the most damning evidence is Grigsby's admission, under oath, that he pleaded guilty to conspiracy to murder Nelson.

**II.    The trial court did not commit reversible error in admitting the evidence to which McCallister objects.**

During its case-in-chief, the State introduced evidence corroborating Stigall's testimony with various electronic data the police obtained during their investigation. Among the corroborating evidence were surveillance video from the Fairfield Inn, an audio recording of a conversation between McCallister and his girlfriend while she visited him in jail, and audio recordings and text messages that the FBI extracted from the participants' mobile phones. The trial judge admitted this evidence over McCallister's objections, and McCallister renews those objections on appeal. In reviewing the admission or exclusion of evidence, we determine whether the trial court abused its discretion. McCarthy v. State, 749 N.E.2d 528, 536 (Ind. 2001). We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it. Knapp v. State, 9 N.E.3d 1274, 1281 (Ind. 2014), cert. denied, 135 S. Ct. 978 (2015). We hold the admission of this challenged evidence was not reversible error.

**A.    Video from Fairfield Inn**

The trial court did not abuse its discretion by admitting State's Exhibit 23—a DVD purporting to show surveillance video from a stationary camera overlooking the lobby at the Fairfield Inn, where several members of the group were staying on February 16 and 17, 2014.

At trial, Stigall testified that she, Nelson, Lackey, and Grigsby left the hotel together not long before the murder. When the State sought to admit surveillance video from the hotel lobby for the hours both before and after Nelson's murder, McCallister objected that the State had not laid an adequate foundation for its admissibility because the hotel manager who testified about the surveillance system was not employed there when the video was taken. After a police officer identified the video as the one he obtained from the hotel just days after the murder, the court admitted the video over McCallister's objection.

The trial court was entitled to admit the surveillance footage as a "silent witness", meaning as substantive rather than demonstrative evidence. For evidence to be admitted for that purpose, there must be a strong showing of authenticity and competency, including proof that the evidence was not altered. See Knapp, 9 N.E.3d at 1282 (stating that foundation for "silent witness" photo and security-camera footage requires court to be persuaded of their competency and authenticity

to relative certainty.). The bottom-left corner of the video shows a time-and-date stamp. Surveillance footage shows the group of four leaving the Fairfield Inn at 2:47 a.m. on February 17, with Nelson carrying a blue duffle bag. It then shows the group, including McCallister, arriving back at the hotel nearly two hours later at 4:38 a.m. without the blue duffle bag—and without Nelson.

On appeal, McCallister argues the State presented an inadequate foundation for admitting the video because the hotel's general manager who authenticated it did not begin working at the Fairfield Inn until September 2014, seven months after the murder. Although the manager was not employed there at the time, he testified he was familiar with the hotel's video-surveillance system, which records the lobby. He recognized the video of the lobby "[w]ithout a doubt", due to its setting, the furniture, and employees shown in the video. He said the video system affixes a date-and-time stamp, and that the current stamp is accurate and has been for as long as he has worked there. The manager explained that a prior manager had been the custodian of the disputed recording and had provided it to police in DVD form, and that he (the current manager) did not see the DVD until after it was turned over to police. The current manager did not compare the recording on the DVD to anything in the hotel's video archives. But police detective Matt Young identified State's Exhibit 23 as the DVD containing the surveillance video, which he obtained from the hotel within days after Nelson's body was found.

We reject McCallister's challenge to this evidence for two reasons. First, the trial court did not abuse its discretion by admitting the video. Although the manager was not able to say with certainty that the DVD contained accurate footage of the lobby on February 17, he did authenticate it in several important respects. He verified the time-and-date-stamp system was accurate and attuned to "standard accepted time" and was reset "in January each year" to ensure accuracy. He "recognize[d] every piece of furniture and some of the people working" in the lobby. And he said the surveillance system is always on, and the videos are backed up to "the cloud"—meaning they are saved to external servers accessible to the hotel's managers through the internet. These verifications, along with the officer's testimony concerning chain of custody, provide sufficient grounds for the trial court to have admitted the video.

10

Second, even if the DVD were admitted improperly, any error would have been harmless because it did not prejudice McCallister's substantive rights. Blount v. State, 22 N.E.3d 559, 564 (Ind. 2014) (citation omitted). The DVD's probable impact on the jury was slight, considering other evidence that was properly admitted. Id. Testimony by Stigall, Grisgby, and Amy Jo Downs (Grigsby's girlfriend at the time of the murder) confirmed the timeline reflected in the video. McCallister himself does not dispute that Stigall, Lackey, Grigsby, and Nelson left the hotel around 2:45 a.m., or that Stigall, Lackey, Grigsby, and he returned about 4:30 a.m. Finally, McCallister did not object to the admission of State's Exhibits 114 and 115—photos or "screen shots" made from the video showing the four leaving the hotel—and these shots were admitted into evidence. Because the surveillance video is duplicative of other evidence, even if the DVD had been admitted in error, the error would be harmless.

### B.    Jailhouse conversation

Nor did the trial court abuse its discretion by admitting a recorded phone conversation between McCallister and his girlfriend, Kelli Wyrick, while she visited him at the Vanderburgh County Jail.

A Warrick County sheriff's deputy had a warrant to search Wyrick's cell phone. The deputy learned Wyrick would be visiting McCallister at the jail on March 7, 2014, at around 12:40 p.m. The deputy met with her at the jail and arranged for her to accompany him to the sheriff's office after her visit with McCallister. The jail has a prisoner-visitor meeting booth where parties communicate by phone. The jail posts notices that visitations are monitored and recorded and can be taped by the sheriff's office. Adjacent to the meeting booth is a lobby area with a telephone that can monitor prisoner-visitor conversations. Using that phone and his own digital recorder, rather than sheriff's equipment, the deputy recorded McCallister's conversation with Wyrick.

At trial, the State played about fifteen seconds of that conversation over McCallister's objection, and the court admitted the entire half-hour recording over his objection as State's Exhibit 111. The record does not disclose which fifteen seconds the jury heard. McCallister objected to the recording, claiming "this is probably a violation of federal wiretapping laws." On appeal, McCallister renews his argument that the trial court should have suppressed the recording

11

because it violated both the Federal Wiretap Act and his privilege against self-incrimination under the United States and Indiana constitutions.

We do not consider McCallister's constitutional argument because he waived it in two respects: by failing to raise it at trial, and by failing to explain how the privilege was implicated on this record. McCallister was not subject to police interrogation. And while McCallister was being recorded, he was not speaking to law enforcement but to his girlfriend over a phone system that both were advised was being monitored by law-enforcement personnel. We likewise decline to reach the merits of McCallister's argument under the Federal Wiretap Act, although two of the Act's exemptions—for "prior consent", 18 U.S.C. § 2511(2)(c), and for a law-enforcement officer acting "in the ordinary course of his duties", id. § 2510(5)(a)(ii)—would seem to apply here.

Even if, as McCallister claims, the trial court erred in admitting the recorded conversation, any error was harmless. McCallister nowhere describes the contents of the recording. And he acknowledges the recording was neither "incriminat[ing]" nor "inculpatory". Thus, McCallister is not entitled to relief because he was not prejudiced by this non-"inculpatory" and non-"incriminat[ing]" testimony.

### C.     Mobile-phone evidence

Although several trial exhibits related to the mobile phones of David Lackey and Kelli Wyrick, McCallister fails to explain precisely which exhibits and court rulings he is objecting to on appeal. His appellate brief explains that he objected at trial to the admission of evidence about the phones or their contents on chain-of-custody grounds. But he does not focus on chain-of-custody issues on appeal or cite any legal authorities discussing chain of custody. Instead, he acknowledges the "cell phone instruments are authenticated" but claims the "identity of the author(s) is not." We presume this means McCallister is challenging the authentication of him as the author of the text messages obtained from Lackey's phone and as a participant in the conversation obtained from Wyrick's phone. We discuss each phone separately.

#### 1.     Lackey's phone

Lackey's mobile phone was identified at trial as State's Exhibit 32, but the trial court did not admit the phone into evidence. Neither did the court admit State's Exhibits 112 and 113—

photographs of text messages purportedly exchanged between McCallister and Lackey. The court did admit State's Exhibit 107, an FBI report detailing the contents of Lackey's mobile phone, and McCallister did not object to its admission. The report includes several text messages sent to and from Lackey's phone.

McCallister argues the FBI report "was shown to the jury over Defense objections to the chain of custody and that no foundation was presented to prove the witness could identify McCallister as a participant in the transmissions." But the record is clear that McCallister did *not* object to chain of custody concerning the FBI report: "I have no further questions and no objection to that exhibit." McCallister did object to testimony from detective Bryan Flowers, who identified one of the phone numbers from the report as McCallister's. Detective Flowers testified that he obtained the phone number from McCallister's parole officer, Heather Sheely, and matched it to one in the report. Flowers further testified that this number was labeled in Lackey's phone as "M-M-C". Flowers did not try to confirm the number was McCallister's through his service provider, AT&T.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). Here, the State presented the testimony of police detective Flowers, who obtained McCallister's phone number through his parole officer and cross-checked it with the FBI report. The State also presented the report itself, admitted without objection from the defense, which shows the number in question was labeled in Lackey's phone as "M-M-C"— which the jury was entitled to conclude referred to Mathew McCallister. Those two pieces of evidence represent a sufficient foundation for admitting the report. Any lingering uncertainty over whom Lackey had been texting with goes only to the report's weight and not its admissibility. The trial court did not abuse its discretion by admitting into evidence an FBI report detailing the contents of text messages sent to and from Lackey's mobile phone.

### 2. Wyrick's phone

Police obtained Kelli Wyrick's cell phone while executing a search warrant of her Jeep, the vehicle she drove to the convenience store the night Nelson was murdered. Her phone was identified at trial as State's Exhibit 33 but not admitted as evidence. The trial court did admit

State's Exhibit 108, an FBI report based on data obtained from her phone, including a conversation from the early-morning hours of February 17. When the State asked to play the recording of that conversation and provide the jurors with a transcript (State's Exhibit 116), McCallister objected that no one had adequately identified the speakers on the recording or identified in the transcript. Detective Flowers testified that he was familiar with the voices from the recording and on the transcript because he had "listened to hundreds of hours of all of these subjects on the phone." McCallister renews the same objection on appeal, arguing "[a]lthough the cell phone instruments are authenticated, the identity of the author(s) is not."

The authentication requirement of Evidence Rule 901(a) is satisfied by testimony identifying a person's voice, "whether heard firsthand or through mechanical or electronic transmission or recording based on hearing the voice at any time under circumstances that connect it with the alleged speaker". Evid. R. 901(b)(5). This is precisely what Detective Flowers offered at trial—his opinion that the voices in the recorded phone call belong to Wyrick, Grigsby, and McCallister, based on his familiarity with their voices from his investigation. The recording and transcript were properly authenticated, and the trial court did not abuse its discretion by admitting them.

As with the other evidence, any error by the trial court in admitting State's Exhibit 108 was harmless because it did not prejudice McCallister. McCallister himself denies any prejudice resulting from this evidence, saying "nothing in the conversations was inculpatory"; the phone transmissions neither "[i]ncriminate McCallister" nor prove anything "with respect to McCallister"; and "the contents … provide nothing to advance the argument, or support the verdict, that McCallister shot Nelson."

### III. McCallister's LWOP sentence is neither unlawful nor improper.

Finally, McCallister argues that his life-without-parole sentence for murder is both constitutionally disproportionate and inappropriate under Appellate Rule 7(B) given the nature of the offense and the character of the offender. As explained below, we reject both arguments. As an aside, we note that McCallister also received a forty-year concurrent sentence for conspiracy to commit murder. He does not challenge that portion of his sentence, so we affirm it without further discussion.

### A. Not disproportionate

At trial, the State pursued a sentence of life without parole against McCallister, alleging as an aggravating circumstance that he murdered Nelson while on parole for another crime. Although McCallister raised several proposed mitigating circumstances—including his GED and college-course credits, his family and social support, and his respectable living environment—the jury found the State had proved beyond a reasonable doubt that McCallister was on parole when he murdered Nelson, and that this aggravating circumstance outweighed any mitigators. The jury unanimously recommended a sentence of life without parole, and the trial court imposed that sentence accordingly.

McCallister asks us to vacate his life-without-parole sentence and impose a term of years, arguing the trial court "did not fully consider the above-referenced proposed mitigators, and abused its discretion in assigning their weight." McCallister faults the trial court because it "did not issue a sentencing order or address aggravators and mitigators, and the weight of each before balancing the aggravators and mitigators and rendering the LWOP sentence." Generally, we leave to the trial court the responsibility to find and weigh the proposed aggravators and mitigators. Covington v. State, 842 N.E.2d 345, 348 (Ind. 2006). We review the relative weight given these factors for a manifest abuse of discretion, Conley v. State, 972 N.E.2d 864, 873 (Ind. 2012), and conclude there was no abuse of discretion here.

It was the *jury*, not the court, that found the on-parole aggravator beyond a reasonable doubt, weighed it against mitigating circumstances, and unanimously determined the proper sentence was life without parole. McCallister identifies no legal authority requiring the *court* to issue findings regarding the presence of aggravating and mitigating factors, or the relative weight to be given them, when the jury recommends sentence.

McCallister also admits that on-parole status "is a valid, constitutional aggravating circumstance for a Life Without Parole sentence". But he argues that his own "parole status for this D-felony[] is so trivial compared to murder[] that it makes this sentence grossly disproportionate". We recently rejected similar arguments in Shoun v. State, 67 N.E.3d 635, 641-42 (Ind. 2017), in which we affirmed the defendant's LWOP sentence although his prior offense was "not so severe". "While Shoun's prior offense, being a habitual traffic offender, is not so

15

severe, Shoun was given the privilege to serve his sentence for that prior offense on work release rather than in prison, and he abused that privilege by fleeing the work release facility and committing murder." See also Knapp, 9 N.E.3d at 1290 ("Committing murder while on probation for any felony offense, even a low-level felony, is therefore a particularly flagrant abuse of that grace and leniency."). McCallister provides no reason for straying from that rationale here.

### B.      Not inappropriate

McCallister also argues that his sentence is inappropriate, and he asks us to revise it under Appellate Rule 7(B). This rule authorizes our appellate courts to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). The principal role of 7(B) review is to leaven the outliers, rather than to achieve a perceived "correct" sentence. Gibson, 51 N.E.3d at 215 (citation omitted). We defer to the trial court's sentence and impose on the defendant the burden of persuading us that a revised sentence is warranted. Rice v. State, 6 N.E.3d 940, 946 (Ind. 2014).

McCallister argues that Nelson's murder was "not particularly gruesome or grotesque". And for his "redeeming qualities", McCallister points out that he "earned a GED and some college and technical credits." To be sure, educational accomplishments can reflect favorably on a defendant under our character-of-the-offender analysis. But McCallister's accomplishments are offset by his premeditated, execution-style murder of Nelson. In addition, the presentence-investigation report recounts McCallister's considerable criminal history, including acts of juvenile delinquency and adult convictions leading to prior periods of incarceration. We conclude McCallister's sentence is not an outlier in need of correction and decline to revise it under Rule 7(B).

### Conclusion

For these reasons, we affirm McCallister's convictions and sentence.

Rush, C.J., and David, Massa, and Goff, JJ., concur.