## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 09 2020, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Megan Shipley
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.F.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

April 9, 2020

Court of Appeals Case No.
19A-JV-1748

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge
The Honorable
Geoffrey A. Gaither, Magistrate

Trial Court Cause No.
49D09-1905-JD-508

**Kirsch, Judge.**

[1] J.F. appeals his adjudication as a delinquent child for committing acts, which, if committed by an adult, would constitute robbery and intimidation, both Level 5 felonies. J.F. raises two issues for our review, which we restate as:

> I. Whether the juvenile court abused its discretion by admitting photographs into evidence at the dispositional hearing; and

> II. Whether the juvenile court abused its discretion by committing him to the Indiana Department of Correction.

[2] We affirm.

## Facts and Procedural History

[3] In the early morning hours of May 6, 2019, J.F., who was sixteen at the time, was out with four or five other male teenaged friends near the intersection of State Street and New York Street in Indianapolis. The friends had been drinking at a party, and J.F. was "really intoxicated." *Tr. Vol. II* at 6. The boys noticed a man and woman, later identified as Austin Brashear ("Brashear") and Ashley Call ("Call"), walking toward a house. Brashear and Call had just been dropped off at Brashear's home by an Uber driver. Brashear and Call exited the vehicle and approached Brashear's house. J.F. and the other boys began to follow Brashear and Call. Brashear turned to the boys and asked them why they were mad at him. In response, J.F. and the other boys ran up to Brashear and Call and attacked them. Brashear was struck in the face, tased with a taser gun, and tackled to the ground.

[4] Brashear attempted to flee and seek help. He ran to a neighbor's house and banged on the front door, but approximately three of the boys continued to physically assault him. One of the boys demanded to know where Brashear's car was. He told the boy that the red Kia was his car, and he heard one of the boys say that "they were taking his f***ing car." *Appellant's App. Vol. II* at 87. Brashear was again tackled to the ground and struck in the face, and the boys took Brashear's cell phone and car keys.

[5] While some of the boys were physically assaulting Brashear, the others were assaulting Call. The boys grabbed her by the head, took her down to the ground, punched her in the back of her head, and began to pound her head into the concrete. They kicked her in the ribs and told her that they were going to kill her. J.F. and his friends stole Call's purse, wallet, and cell phones.

[6] J.F. and at least one other member of the group stole Brashear's car. Shortly after stealing the car, J.F. picked up B.S., his girlfriend and the mother of his young child.[1] They were then involved in a car accident near the intersection of 10th Street and Tuxedo Street. The youths fled the scene, but one left his cell phone in Brashear's car. J.F., B.S., and one other boy went back to the car to retrieve it. When they returned to the car, they were confronted by Donald Bolton ("Bolton") and Brice Siders ("Siders"), who had heard the collision and approached to investigate. The boys began reaching into the car, trying to

---

[1] J.F. fathered the child when he was fifteen or sixteen years old.

remove items. Bolton tried to stop them. The boys then tried to assault Bolton, and J.F. pulled out a gun and threatened to shoot Bolton. Siders intervened to protect Bolton, and J.F. pointed the gun at Siders, saying, "[W]hat are you gonna do now?" *Id.* at 89. He also told Siders to "get back" or else "we will jump [you.]" *Id.* at 90. J.F. then approached Siders and said, "[You ain't] so tough now." *Id.* at 89.

[7] The juveniles ran away, stopped down the street, and opened the door to another vehicle. Siders yelled at them and began to move in their direction, but J.F. pointed the gun at Siders again and said, "[Y]ou better back the hell up." *Id.* The juveniles then ran away towards 9th Street. When police arrived, the three juveniles were standing at the corner of 9th Street and Tuxedo Street. Siders alerted the police of their presence. The juveniles attempted to flee, but J.F. was apprehended by the police at the scene.

[8] On May 13, 2019, the State filed a petition alleging J.F. to be a delinquent child. He was charged with two counts of Level 5 felony robbery if committed by an adult, one count of intimidation as a Level 5 felony if committed by an adult, and one count of pointing a firearm as a Level 6 felony if committed by an adult. The juvenile court held an admission agreement hearing on June 3, 2019. Pursuant to the written admission agreement, J.F. admitted to one count of robbery and one count of intimidation, and the State agreed to dismiss the other two counts. The juvenile court accepted the admission and adjudicated J.F. a delinquent. *Tr. Vol. II* at 9. When the judge asked J.F. why the incident occurred, J.F. responded, "I am not going to put it all on that I was intoxicated

but I really didn't know what I was doing. I was intoxicated sir. It wasn't me." *Id.*

[9] The juvenile court held a dispositional hearing on July 1, 2019. Call told the court about the injuries she suffered, and described the robbery as the "most terrifying thing" she and Brashear had ever gone through. *Id.* at 18. The State introduced photographs of Brashear's injuries, the stolen car, and J.F., which were admitted into evidence over objection. *Id.* at 16-17.

[10] The probation department recommended that J.F. be placed on suspended commitment to the Indiana Department of Correction ("DOC") and that he receive residential treatment at Transitions Academy, where he had been accepted. *Id.* at 19. The Indiana Department of Child Services ("DCS") agreed with the recommendation for placement at Transitions Academy. *Id.*; *Appellant's App. Vol. II* at 108. The pre-dispositional report stated that "Commitment [to the DOC] is not a good option for [J.F.] as he is in need of therapeutic services to address the underlying trauma in his life. [J.F.]'s age and low IQ point to a need for therapeutic services." *Appellant's App. Vol. II* at 106. The State requested that J.F. be committed to the DOC; defense counsel asked that he be placed at home with home-based services. *Tr. Vol. II* at 17, 20-21.

[11] At the conclusion of the hearing, the juvenile court ordered J.F.'s commitment to the DOC and recommended a term of nine months. *Id.* at 22. The court ordered J.F. to participate in education and vocational programs, substance

abuse programs, and "whatever services are available to address [his] adolescent anti-social behavior issues" that had been identified in a psychological evaluation that J.F. underwent. *Appellant's App. Vol. II* at 121; *Tr. Vol. II* at 22. Upon J.F.'s release from his commitment, the court ordered him to complete the Transition from Restrictive Placement program, participate in the Project Life program, and complete forty hours of community service. *Appellant's App. Vol. II* at 11-12. J.F. now appeals.

# Discussion and Decision

## I. Admission of Photographs

[12] J.F. asserts that the juvenile court erred when, over his objection, it admitted into evidence at his dispositional hearing six photographs, which are three photographs depicting Brashear's injuries; two photographs of Brashear's stolen car after the collision; and J.F at the time of his arrest. J.F. argues that the State failed to lay a proper foundation for their admission.

[13] The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *K.F. v. State*, 961 N.E.2d 501, 510 (Ind. Ct. App. 2012), *trans. denied*. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. *Id.* at 510-11. "'Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.'" *J.L. v. State*, 5 N.E.3d 431, 436 (Ind. Ct. App. 2014) (quoting *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995)).

[14]     J.F. contends that there was an inadequate foundation for the admission of the photographs because the State failed to prove they were true and accurate representations of what they were intended to portray. During the dispositional hearing, the following colloquy took place between the juvenile court and counsel:

> [THE STATE]: . . . . Judge, State offers what has been marked as exhibits 1-6 [(the photographs in question)], may I approach?
>
> THE COURT: Yes.
>
> [THE STATE]: State's exhibit 1 depicts [a] male victim, in this case, Austin Brashear –
>
> [DEFENSE]: – I am going to object. She is testifying.
>
> THE COURT: Overruled. Go ahead please.
>
> THE STATE: Judge if you like, I could ask my witness to identify –
>
> THE COURT: – no, no. Go ahead.
>
> THE STATE: – and law [sic] foundation for all of these exhibits –
>
> THE COURT: – no. Go ahead please. Go.
>
> [THE STATE]: #2 is a photograph of his arm after he was beaten and thrown to the pavement, tased. #3 his stomach. #4 the stolen vehicle that was crashed and totaled. #5 another view

of that and in particular we would like to draw the Court's attention to photo #6. This is a photo of [J.F.] after he was apprehended. . . .

[DEFENSE]: Your Honor, I would like to just show a continuing objection to State's exhibits for lack of foundation and relevance. . . .

THE COURT: Alright. Noted. . . .

*Tr. Vol. II* at 16-17.

[15] Generally speaking, to lay a foundation for the admission of evidence, the proponent must show that it has been authenticated. *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*. Writings, recordings, photographs, and data compilations are included within the authentication requirements of Indiana Evidence Rule 901(a), which provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.*; Ind. Evidence Rule 901(a). However, the photographs in question were admitted during J.F.'s dispositional hearing, and J.F. acknowledges that the rules of evidence do not strictly apply at juvenile dispositional hearings. *See N.L. v. State*, 989 N.E.2d 773, 778-779 (Ind. 2013) ("Many juvenile hearings are conducted informally, and are not strictly governed by the rules of evidence."). For example, "hearsay is admissible in dispositional hearings, and subsequent hearings to modify a disposition, because [e]xcluding hearsay evidence . . . would in many cases disserve the

child by excluding relevant information that might support a less restrictive disposition." *Id.* at 779 (internal quotations omitted). And, at a dispositional hearing, a pre-dispositional report may be admitted into evidence "to the extent it is probative, even if the report would otherwise be excluded." *Id.* (internal quotations omitted). Furthermore, it is well-settled that "[t]he [evidence] rules, other than those with respect to privileges, do not apply in . . . [p]roceedings relating to . . . sentencing, probation, or parole." Ind. Evidence Rule 101(d); *see also White v. State*, 756 N.E.2d 1057, 1061 (Ind. Ct. App. 2001) (stating "[w]hen a trial court makes its sentence decision, 'the rules of evidence, other than those concerning matters of privilege, do not apply.'"), *trans. denied*.

[16] Even if we were to assume, arguendo, that the rules of evidence applied here, and the juvenile court erred in admitting the photographs, any error was harmless. The improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact. *Purvis v. State*, 829 N.E.2d 572, 585 (Ind. Ct. App. 2005), *trans. denied*. At J.F.'s admission agreement hearing, J.F. admitted that he punched, "start[ed] hitting on[,]" and threatened force against Brashear; robbed Brashear of his car keys and cell phone; stole and crashed Brashear's car; and was arrested following the assault and the car crash. *Tr. Vol. II* at 5-8. The pre-dispositional report included a detailed account of what occurred the night of the attack, including Brashear's injuries, the condition of his car following the crash, and J.F.'s subsequent arrest. *Appellant's App. Vol. II* at 87-90. Call provided a statement at the dispositional hearing, describing the viciousness of

the attack. *Tr. Vol. II* at 17-18. Thus, the photographs admitted at the dispositional hearing were merely cumulative of J.F.'s admission, the information contained in the pre-dispositional report, and Call's statement. *See, e.g., D.Z. v. State*, 100 N.E.3d 246, 249 (Ind. 2018) ("The photos were thus cumulative of other substantial evidence, so any error in their admission was harmless." (citing *McCallister v. State*, 91 N.E.3d 554, 562-63 (Ind. 2018))).

## II. Placement

[17]   J.F. next contends that the trial court abused its discretion when it ordered him to be placed in the DOC for a recommended nine-month term because it was not the least restrictive placement and was contrary to the probation department's recommendation. J.F. argues that "[i]t is clear from the record" that he needs treatment for substance abuse; more structure and support in his education; and counseling to address "the difficulties he has faced because of his parents' absence, incarceration, and drug use." *Appellant's Br.* at 15. He maintains that all of these concerns could be addressed during residential treatment at Transitions Academy – the dispositional alternative identified by the probation department and approved by DCS. *Id.* Furthermore, according to J.F., he has a limited juvenile history; and "a placement at Transitions Academy . . . would have met the goals of rehabilitation without preventing [him] from having meaningful contact with his mother, grandfather, sister, and child." *Id.* at 15, 16.

[18] "A juvenile court is accorded 'wide latitude' and 'great flexibility' in its dealings with juveniles." *J.T. v. State*, 111 N.E.3d 1019, 1026 (Ind. Ct. App. 2018) (citing *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008)), *trans. denied*. The choice of a specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed if there has been an abuse of that discretion. *Id.* "The juvenile court's discretion in determining a disposition is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least-harsh disposition." *Id.* An abuse of discretion occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it. *Id.*

[19] The goal of the juvenile process is rehabilitation rather than punishment. *Id.* "'Accordingly, juvenile courts have a variety of placement options for juveniles with delinquency problems, none of which are considered sentences.'" *Id.* (quoting *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010)). Indiana Code section 31-37-18-6 provides a list of factors that the juvenile court is to consider in entering a dispositional decree. The statute specifically provides that:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:

> (A) in the least restrictive (most family like) and most
> appropriate setting available; and
>
> (B) close to the parents' home, consistent with the best
> interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the
> child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the
> child's parent, guardian, or custodian.

Ind. Code § 31-37-18-6. "[T]he statute recognizes that in certain situations the best interest of the child is better served by a more restrictive placement." *J.S.*, 881 N.E.2d at 29 (citing *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied*). The law requires only that the disposition selected be the least restrictive disposition that is "consistent with the safety of the community and the best interest of the child[.]" *J.T.*, 111 N.E.3d at 1026.

[20] Turning to the facts before us, we find that J.F.'s commitment to the DOC furthers the rehabilitative goals of the juvenile justice system. At the time of the disposition of this case, J.F. was sixteen years old and had been involved in the juvenile justice system since he was thirteen years old. His delinquency history included one prior true finding in 2016 for escape, a Level 6 felony when

committed as an adult. J.F. was on formal probation from October 2017 until June 2018, when the juvenile court closed the case as "failed" and services with the Cross System Care Coordination program were not completed. *Appellant's App. Vol. II* at 35. J.F. has had other delinquent charges, including, attempted battery against a public safety official in March 2016; escape in January and October 2017; auto theft in October 2017; visiting a common nuisance and possession of marijuana in December 2017; and leaving home without permission of parent, guardian, or custodian in March 2018. *Id.* at 91-93. Between his detainment on May 6, 2019 (for the attack on Brashear and Call), and June 28, 2019, J.F. received six incident reports, five of which were for "overt refusal to comply" and one for property destruction. *Id.* at 104.

[21] J.F. has admitted to a history of marijuana and alcohol use and to the previous use of methamphetamine, Xanax, and cocaine. *Id.* at 103. He tested positive for amphetamines/methamphetamine in two previous cases. *Id.*

[22] J.F. underwent a psychological evaluation in April 2018. He was found to have an IQ of 79 and was diagnosed with "Adolescent Antisocial Behavior and Cannabis Use Disorder." *Id.* at 104. The psychological evaluation determined that J.F. would "benefit from living in a predictable, well-established environment" and recommended substance abuse treatment and individual psychotherapy. *Id.* In his dispositional risk assessment, J.F. scored at an overall "[h]igh risk to reoffend[.]" *Id.* at 105. The pre-dispositional report recommended out-of-home placement because J.F. "has been offered community-based services, however his behavioral problems have increased in

severity, making it difficult to keep youth and those around him safe." *Id.* at 106. The report also stated that J.F. "remains a risk to himself by engaging in risky behaviors including substance use and activity with anti-social peers[,]" and J.F. and "his family have been offered a multitude of services through our court, however, the family did not take advantage of these services." *Id.* at 107.

[23] Finally, J.F. perpetrated and participated in a vicious attack on two unsuspecting victims, Brashear and Call. He tackled Brashear to the ground, struck him in the face, tased him, and robbed him of his car keys and cell phone. J.F. stole Brashear's car, crashed it, and then pulled out a gun and threatened to shoot two innocent bystanders. At the dispositional hearing, Call told the juvenile court that the ordeal was "the most terrifying thing" she and Brashear had ever endured and added that

> the fact that I feel that there is absolutely no remorse is even worse. It was awful and it was so personal and us just going to [Brashear]'s house to let his dogs out and them coming up knowingly wanting to harm people, knowing what they were about to do and not one person stopping it, not one person stopping it.

*Tr. Vol. II* at 18. When J.F. addressed the juvenile court, he expressed no remorse, took little responsibility for his actions, and blamed his friends for negatively influencing him, stating:

> I was just present and I feel like I was just in the wrong place at the wrong time but I was influenced under alcohol but I was there and I do take my consequences of being there and letting that happen. I am sorry for what my friend did and I

(intelligible) stop [sic] and Your Honor, I would like to say something to you; I was under the influence of alcohol, I was very, very drunk and my friends were influencing me to do bad and that is all I would like to say. I would just like to say that I am sorry and hopefully, you will never have to see my face again.

*Id.* at 22.

[24] The juvenile court ultimately determined that J.F. should be committed to the DOC. It is well-settled that there are times when commitment to a suitable public institution is in the best interest of the juvenile and society. *J.S*, 881 N.E.2d at 29. "In some instances, confinement may be one of the most effective rehabilitative techniques available." *B.K.C. v. State*, 781 N.E.2d 1157, 1172 (Ind. Ct. App. 2003) (upholding the juvenile court's order of wardship of B.K.C. to the DOC after fourteen-year-old B.K.C. was adjudicated delinquent for the act of Class B felony robbery if committed by an adult for robbing a restaurant at gunpoint with an older accomplice). In this case and under these circumstances, we cannot say that the juvenile court's decision was an abuse of discretion or that it was not in J.F.'s best interests. The juvenile court did not abuse its discretion by ordering J.F. committed to the DOC.

[25] Affirmed.

Bailey, J., and Mathias, J. concur.