



FILED
Sep 05 2024, 2:57 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 23S-LW-19

## Mathew J. Cramer, II,
*Appellant (Defendant below),*

–v–

## State of Indiana,
*Appellee (Plaintiff below).*

---

Argued: April 25, 2024 | Decided: September 5, 2024

Appeal from the Allen Superior Court 6
No. 02D06-2104-MR-000007
The Honorable David M. Zent

---

**Opinion by Justice Massa**

Chief Justice Rush and Justices Slaughter, Goff, and Molter concur.

**Massa, Justice.**

A jury found Mathew Cramer guilty of murdering and dismembering Shane Nguyen and recommended a sentence of life imprisonment without parole ("LWOP"), which the trial court accordingly imposed. On direct appeal, Cramer asks this Court to revise his sentence to a term of years under Appellate Rule 7(B). Because Cramer's acts and character fail to satisfy Appellate Rule 7(B)'s requirements, we reject that request and affirm.

# Facts and Procedural History

Mathew Cramer lived in a storage unit in Fort Wayne. One day, as Cramer was walking to the mall, Shane Nguyen pulled his minivan beside him and asked if he wanted a ride. Cramer accepted.

Nguyen and Cramer stopped for food and then went to Goshen to collect Cramer's paycheck. Upon arriving back at the storage shed, Nguyen told Cramer that Cramer "owed" him for the ride, so Cramer allowed Nguyen to perform oral sex. Tr. Vol. III at 206. Afterward, the two exchanged phone numbers to talk again in the future.

A few weeks later, Cramer texted Nguyen for another ride. Nguyen explained he was out of town and was unsure whether he had time to drive Cramer. Cramer then promised to give Nguyen a "surprise" that Nguyen would like if he agreed to help. *Id.* at 210. After receiving a sexually explicit photograph of Cramer, Nguyen agreed to pick Cramer up in Elkhart and drive him back to Fort Wayne. As they drove from Elkhart, Cramer decided he wanted to kill Nguyen and hatched a plan to murder him.

Once at the storage unit, Cramer and Nguyen climbed into the back seats of the minivan, and Cramer asked Nguyen to remove his shirt. As Nguyen turned around, Cramer put him in a choke hold, and increased pressure as Nguyen's body shook. Cramer then exited the minivan and dragged Nguyen's body into the storage unit causing Nguyen's head to hit the concrete floor. Once inside the storage unit, Cramer noticed

Nguyen was still alive and punched him in the back of his head and stomped on his chest.

Meanwhile, Nguyen's wife became worried because her husband had not yet arrived home and tried to call and track Nguyen's phone multiple times to no avail. Eventually, she reported her husband missing, and a Silver Alert was issued for information on his whereabouts.

The next day, Cramer drove Nguyen's van to a friend's house and informed his friends that he had killed Nguyen. The group of friends went to two stores to buy tarps, bungie cords, a machete, shovels, a bucket, a plastic tub, a tarp, a large sheet of all-purpose plastic, trash bags, a hacksaw, and extra hacksaw blades.

Once back in the storage unit, Cramer and his friend Jacob Carreon-Hamilton recorded their actions on a cell phone. Prior to decapitating Nguyen, Cramer manipulated Nguyen's mouth like a puppet, making him appear to ask, "Am I dead?" and forced Nguyen's head to nod up and down as if answering "yes." St. Ex. 77 at 53:28–54:00. Then Cramer and Carreon-Hamilton began to dismember Nguyen's arms and legs. At one point, Cramer used Nguyen's severed arm to give himself a high-five. Cramer and Carreon-Hamilton placed Nguyen's head, arms, and legs into six separate trash bags, while his torso was put into another trash bag and then into the plastic tub. Nguyen's dismembered body was moved into the minivan and Cramer and Carreon-Hamilton searched for a place to bury the body, eventually stopping at a vacant building near the storage facility.

While on patrol that evening, a Fort Wayne police sergeant spotted the minivan's tail lights behind the vacant building. The sergeant pulled up behind the minivan, searched the license plate, discovered it was linked to the Silver Alert for Nguyen, and initiated a stop. Once the driver, Carreon-Hamilton, pulled over, the sergeant approached the driver's-side door. As he looked into the minivan, Carreon-Hamilton looked back at him and sped off.

The sergeant followed the minivan for five blocks before Carreon-Hamilton opened the minivan's door, jumped out, and ran. Cramer, who

was in the passenger seat, moved over to the driver's side and continued driving. Cramer swerved through a gas station parking lot, hit a light pole, and crashed through a privacy fence. After coming to a stop, Cramer jumped out of the minivan and fled the scene. Shortly after, officers found the minivan, obtained a search warrant, and traced evidence to Cramer and his friends. The police then located Cramer in Lakeville and transported him back to Fort Wayne to await trial.

The State charged Cramer with murder, Level 6 felony abuse of a corpse, and Level 6 felony resisting law enforcement. Listing the dismemberment as a qualifying aggravator, the State requested—and the trial court granted—permission to seek an LWOP sentence. Cramer moved for a pretrial determination of intellectual disability, explaining that Indiana law required a "court ordered evaluative report." Ind. Code § 35-36-9-2. The trial court granted the motion and appointed Dr. Ned P. Masbaum. Dr. Masbaum reported that Cramer was diagnosed with 15q13.3 microdeletion syndrome, which generates a predisposition to "cognitive impairment, autism spectrum disorder, hyperactivity, attention problems, withdrawal, [and] aggressive and antisocial behavior." Appellant's App. Vol. II, p. 88. The report also revealed Cramer was diagnosed with conduct disorder, persistent depressive disorder, and attention deficit/hyperactivity disorder in the past. Even so, Dr. Masbaum reported Cramer was "alert, cooperative, and had no disorganized speech[.]" *Id.* at 89. Dr. Masbaum estimated Cramer's IQ to be between 71 and 84 and determined Cramer had borderline intellectual functioning. After a hearing, the trial court found Cramer "did not prove by clear and convincing evidence that [he] is an individual with an intellectual disability." *Id.* at 94.

A jury found Cramer guilty of Count I, murder; Count II, abuse of a corpse, a Level 6 felony; and Count III, resisting law enforcement, a Level 6 felony. The jury recommended LWOP. The trial court imposed the recommended sentence and found Cramer's prior criminal history, failed attempts at rehabilitation, and the nature and circumstances of the crime in aggravation and did not find any mitigating factors. The trial court sentenced Cramer to LWOP and concurrent two-year sentences for the remaining Level 6 felony convictions.

Cramer directly appealed to this Court. *See* Ind. Appellate Rule 4(A)(1)(a).

## Standard of Review

When a defendant is found guilty of murder by a jury and the State pursues an LWOP sentence, the jury will reconvene for a sentencing hearing. I.C. § 35-50-2-9(d). If the jury provides a sentencing recommendation of LWOP, the court is required to follow it. *Id.* § -9(e). When an appellant seeks revision of that sentence, the Indiana Constitution grants this Court the authority for independent appellate review to alter a sentence imposed by the trial court. Ind. Const. art. VII, § 4. When an appellant requests us to exercise this constitutional authority by revisiting and reducing an LWOP sentence to a term of years, that power is cabined in Appellate Rule 7(B).

Instead of acting as a procedural hurdle that a defendant must overcome to be heard, the rule establishes a standard of review meant to guide the appellate courts. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Appellate Rule 7(B) empowers appellate revision if the reviewing court finds the sentence is "inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). Even if the trial court carefully adhered to the sentencing procedure, this Court has the authority under Appellate Rule 7(B) to modify the sentence if we deem it inappropriate based on the nature of the offense and the character of the offender. *Childress*, 848 N.E.2d at 1079.

## Discussion and Decision

Cramer argues the LWOP sentence was inappropriate and asks us to revise it under Appellate Rule 7(B) to an aggregate term of years. We disagree and affirm the trial court.

"[L]ife without parole is reserved for use in only the most heinous of crimes that so shock our conscience as a community." *Conley v. State*, 972 N.E.2d 864, 880 (Ind. 2012). Indiana's appellate courts are authorized by

the Indiana Constitution to conduct an independent review and revision of a trial court's decision. *See* Ind. Const. art. VII, § 4. Appellate Rule 7(B) empowers appellate courts with the ability to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B); *see also Oberhansley v. State*, 208 N.E.3d 1261, 1270–71 (Ind. 2023) (quoting App. R. 7(B)).

Appellate Rule 7(B) serves "to leaven the outliers, rather than to achieve a perceived 'correct' sentence," *McCallister v. State*, 91 N.E.3d 554, 566 (Ind. 2018), allowing revision of a sentence if the court finds the trial court's decision to be inappropriate in consideration of the nature of the offense and the offender's character, *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7(B)). "Ultimately, our constitutional authority to review and revise sentences boils down to our collective sense of what is appropriate," *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017) (cleaned up), an act that is reserved for "exceptional" cases, *Gibson v. State*, 43 N.E.3d 231, 241 (Ind. 2015). It is up to the defendant to "persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Childress*, 848 N.E.2d at 1080. The trial court's sentence is afforded considerable deference and will stand unless "compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015)."

## I.  The nature of Cramer's offenses involves extreme brutality and justifies his sentence.

Cramer argues that LWOP is not appropriate because his killing of Nguyen, while terrible, is different from other cases that involve dismemberment. Yet Rule 7(B) does not require us to compare Cramer's actions with actions of other offenders; but it does require us to compare Cramer's actions "with the required showing to sustain a conviction

under the charged offense[.]" *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013) (citing *Cardwell v. State,* 895 N.E.2d 1219, 1224 (Ind. 2008)), *trans. denied*.

The record shows that Cramer admitted he decided to kill Nguyen as they passed through Columbia City; Cramer intentionally put Nguyen in a vulnerable position by asking him to take his shirt off; Cramer put Nguyen into a chokehold; once inside the storage shed, Cramer hit and kicked Nguyen to make certain Nguyen was dead; Cramer and his friend video-recorded their actions on a cell phone; Cramer abused Nguyen's corpse by manipulating Nguyen's mouth, making it appear to ask, "Am I dead?" and caused Nguyen's head to nod up and down as if to answer "yes"; Cramer used Nguyen's severed left arm to give himself a high-five; Cramer and his friend used a machete to dismember Nguyen's other limbs; Cramer placed Nguyen's dismembered body parts into various trash bags and a plastic tub, and placed them into the minivan to search for a place to bury Nguyen's body. After lining the minivan's floor with a tarp, Cramer and his friend moved the trash bags and tub into the minivan and drove to search for a place to bury Nguyen's body, eventually stopping at a vacant building near the storage facility; and Cramer fled from the police, both by driving the minivan and running on foot.

Given these facts, Cramer fails to show the offense involved restraint or a lack of brutality. *See Stephenson*, 29 N.E.3d at 122.

Cramer also asks us to consider the sexual quid pro quo nature of Cramer's and Nguyen's relationship, arguing a power imbalance because Cramer was homeless and vulnerable, and Nguyen provided him with food and transportation in exchange for sexual acts. Yet Cramer fails to recognize that the record shows Cramer texted Nguyen for a ride from Elkhart to Fort Wayne and Nguyen responded that he could not help; Cramer even testified that he offered Nguyen a "surprise" in exchange for a ride; Nguyen responded positively to Cramer's surprise offer; Cramer texted a photo of his penis to Nguyen; and Cramer promised Nguyen they would "play" when they arrived at the storage unit. These facts fail to mitigate the brutality of the crime.

For these reasons, the nature of Cramer's offenses is horrendous and justifies his sentence.

## II. Cramer's criminal history reflects poorly on his character and justifies his sentence.

Consideration of the character of the offender involves a broad analysis of the defendant's "qualities, life, and conduct." *Crabtree v. State*, 152 N.E.3d 687, 705 (Ind. Ct. App. 2020), *trans. denied*. Cramer argues that we should consider his diagnosed genetic disorder that "predisposed him to develop a number of conditions . . . including cognitive impairment, ADHD, and antisocial personality disorder" to support a finding that his sentence is inappropriate. Appellant's Br. at 19. Cramer's argument fails because he does not explain how his genetic disorder contributed to him committing the offenses, and the record includes Dr. Masbaum's psychiatric opinion that Cramer is not intellectually disabled, despite Cramer having various disorders. *Gibson*, 43 N.E.3d at 241.

The State argues Cramer's criminal history supports his sentence. A defendant's criminal history is a relevant factor in the character analysis. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). "Even a minor criminal record reflects poorly on a defendant's character[.]" *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. Ct. App. 2017). The presentence investigation report shows Cramer has five juvenile adjudications, three of which are felonies if committed by an adult. For these reasons, his "history of criminal conduct" weighs against relief. *See Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007).

## Conclusion

Considering the vicious nature in which Cramer took Nguyen's life and the lack of redemptive character, we do not find this to be an outlier case that justifies appellate sentence modification. Finding Cramer's LWOP sentence appropriate, we decline to revise it under Appellate Rule 7(B).

Rush, C.J., and Slaughter, Goff, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT MATHEW J. CRAMER, II
Victoria Bailey Casanova
Casanova Legal Services, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE STATE OF INDIANA
Theodore E. Rokita
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana