

FILED

Sep 23 2020, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Todd L. Sallee
Brooke N. Russell
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bryan L. Flowers,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 23, 2020

Court of Appeals Case No.
19A-CR-322

Appeal from the Allen Superior
Court

The Honorable Frances C. Gull,
Judge

Trial Court Cause No.
02D05-1804-MR-9

**Pyle, Judge.**

# Statement of the Case

Bryan Flowers ("Flowers") appeals his conviction by jury of murder[1] and the sentence imposed thereon. He argues that the trial court abused its discretion when it: (1) granted the State's motion to continue Flowers' trial; (2) admitted evidence; and (3) ordered Flowers to pay $5,000 in restitution; and that (4) his eighty-five (85) year sentence is inappropriate in light of the nature of the offense and his character. Concluding that the trial court did not abuse its discretion and that Flowers' sentence is not inappropriate, we affirm Flowers' conviction and sentence.

We affirm.

# Issues

1. Whether the trial court abused its discretion when it granted the State's motion to continue Flowers' trial.

2. Whether the trial court abused its discretion when it admitted evidence.

3. Whether the trial court abused its discretion when it ordered Flowers to pay $5,000 in restitution.

4. Whether Flowers' sentence is inappropriate in light of the nature of the offense and his character.

---

[1] IND. CODE § 35-42-1-1.

# Facts

[3] In the early morning hours of December 23, 2017, Flowers, Javon Rolan ("Rolan"), and Deandre Voss ("Voss") were at a party at an upstairs apartment in building 2A at the Villages of Hanna ("the Villages of Hanna") in Fort Wayne. Rolan had known Flowers for nine years, and Flowers was the father of Rolan's sister's child. Voss was a friend of Rolan's family. Flowers and Voss also knew each other. At some point, Voss and Flowers left the party at the same time.

[4] Shortly thereafter, Rolan heard loud voices coming from outside the apartment. Rolan left the party and went downstairs, where he saw Voss and Flowers arguing at the entrance to building 2A. As the argument between Voss and Flowers became more heated, Rolan saw Flowers pull out the Glock 9 that Flowers regularly carried. Voss, who had a beer bottle in each hand and who had kept his hands at his sides throughout the verbal altercation, told Flowers, "I got guns too" as he turned and walked away from the confrontation. (Tr. Vol. 2 at 152). When he got to the end of the sidewalk, Voss turned around and walked back to Flowers, and again said, "I got guns too." (Tr. Vol. 2 at 153). Rolan attempted to intervene and told Voss to go home and Flowers to go back to the party. However, Flowers pulled the chamber back on his gun and loaded it before shooting Voss in the face. Voss fell to the ground, and Rolan ran back to the party. Flowers walked back into the apartment building and down the hallway. He exited the building through a rear door.

[5]     At approximately 4:00 a.m., an anonymous caller contacted 911 and reported hearing a shot fired and seeing a man on the ground in front of building 2A at the Villages of Hanna. Fort Wayne Police Department officers were dispatched to the scene and found a critically injured Voss lying on the ground. Voss died before medical personnel arrived. Fort Wayne Police Department officers searched the scene of the shooting and found a spent shell casing and two beer bottles near Voss' body.

[6]     Shortly thereafter, Fort Wayne Police Department Sergeant Thomas Strausborger ("Sergeant Strausborger") arrived at the scene to investigate the homicide. Sergeant Strausborger, who was also the security director for Millenia Companies, which owns the Villages of Hanna, was familiar with the Villages of Hanna's security camera system. Specifically, Sergeant Strausborger understood how the security camera system worked and had access to all of its recordings. He knew that there was a camera focused on the front door of building 2A, and he accessed footage from the security camera that had recorded the confrontation between Flowers and Voss as well as the shooting.

[7]     Sergeant Strausborger watched the video of the confrontation, which showed Flowers, Voss, and Rolan. Flowers was standing in the doorway of building 2A, Voss was standing face to face with Flowers, and Rolan, who was shorter than both Flowers and Voss, was attempting to intervene in the altercation. Flowers brought his arm up and pointed the gun in his hand at Voss' face. A few seconds later, Voss fell to the ground. Because Flowers was wearing a

hooded sweatshirt and there was no clear view of his face, Sergeant Srausborger was not able to immediately identify the shooter.

[8] Sergeant Strausborger also accessed video footage of Flowers after the shooting. The videos, which were taken from several different buildings at the Villages of Hanna, showed Flowers running through the apartment complex to his van. In one video, Flowers raised his hand and made a gesture with his index and pinky fingers up and his middle and ring fingers down with his thumb. In another video, Flowers, who was smoking a cigarette, tossed the cigarette butt on the ground. A police officer later retrieved the cigarette butt, which tested positive for Flowers' DNA. Another video showed Flowers getting into his van in the parking lot and driving away with his lights off. Additional videos showed Flowers driving around the Villages of Hanna and parking in different areas of the complex as emergency vehicles responded to the scene of the shooting. Flowers returned his van to its original parking place at approximately 7:30 a.m. After viewing the videos from the Villages of Hanna's security system, Sergeant Strausborger preserved and saved them.

[9] Later that day, Fort Wayne Police Department officers towed Flowers' van. Police officers also questioned but did not arrest Flowers. A few days later, Flowers told Rolan that the police had questioned Flowers about the shooting. Flowers asked Rolan if the police had questioned him. Rolan responded that he had not been questioned, and Flowers told Rolan to "keep [his] mouth closed[.]" (Tr. Vol. 2 at 161). Flowers also told Rolan that if the police questioned him to say that he had heard a shot while he was at the party but

had not seen anything. Flowers also told Rolan that the surveillance cameras at the Villages of Hanna were inoperable.

[10] A few months after the shooting, Rolan was arrested for domestic battery and resisting law enforcement. At the time of his arrest, Fort Wayne Police Department Detective Engelman ("Detective Engelman") questioned Rolan about Voss' murder. Rolan initially followed Flowers' instructions and told the detective that he had heard a shot but had not seen anything. When Detective Engelman told Rolan that a surveillance camera had recorded the confrontation between Flowers and Voss, Rolan admitted that he had seen Flowers shoot Voss in the face.

[11] On April 20, 2018, the State charged Flowers with murder and an enhancement for the use of a firearm during the murder. Four days later, on April 24, 2018, the trial court appointed a public defender to represent Flowers. The public defender filed an appearance on May 4, 2018. Five days later, after a hearing, the trial court scheduled Flowers' trial for September 25-27, 2018. The trial court's order specifically noted that Flowers "accept[ed] dates." (Chronological Case Summary, May 9, 2018 entry).

[12] However, on May 14, 2018, the trial court received a handwritten letter from Flowers stating that he wanted to exercise his right to a speedy trial. The letter was filed on the trial court's CCS as "correspondence to/from Court." (Chronological Case Summary, May 16, 2018 entry). On May 22, 2018, the State filed a motion to continue the trial until the end of October 2018. In the

motion, the prosecutor explained that he was acting as a special prosecutor in a murder case in another county from October 1 through October 5, 2018 and that he should have reserved the week before trial for pre-trial motions and matters in that case. The trial court scheduled a hearing on the State's motion to continue for May 30, 2018.

[13] Two days after the State had filed its motion to continue, on May 24, 2018, Flowers sent the trial court another handwritten letter requesting a speedy trial. According to Flowers, he was a "complete[ly] in[nocent] man being detained in Allen County Jail." (Chronological Case Summary, May 24, 2018 entry). This letter was also filed as "correspondence to/from Court." (Chronological Case Summary, May 24, 2018 entry). A separate entry in the CCS states that the trial court sent Flowers' correspondence to Flowers' counsel of record.

[14] At the beginning of the May 30 hearing on the State's motion to continue, Flowers asked the trial court if he could speak and pointed out that he had sent the trial court two written requests for a speedy trial. The trial court responded that it had received his requests, and defense counsel told the trial court that defense counsel had had "two (2) conversations with Mr. Flowers concerning the issue, the concept of a speedy trial." (Supplemental Transcript of May 30, 2018 Hearing, Vol. 2 at 7). Defense counsel further explained as follows:

> [T]here are times when . . . as a strategy . . . it is to the advantage of Defense to ask for a speedy trial. . . . [A]nd there are times when strategy dictates the necessity of preparation so that we are properly prepared for trial. I don't view this as a case where a speedy trial is an appropriate strategy. . . . I got last week . . .

twenty (20) discovery discs . . . that involve surveillance, reports, other matters. . . .  I spent this weekend looking at two (2) of them and that took me about six (6) hours.  So, I'm anticipating that to get through these various discs is gonna require some exponential amount of time. . . .  [The] police reports will be forthcoming. . . .  There are quite a number of witnesses the State has listed . . . that Mr. Flowers has asked me about taking depositions of. . . .  I have met with two (2) of Mr. Flowers' potential witnesses who have given me the names of eight (8) to ten (10) people who are potential witnesses that we'll have to track down and interview through the Public Defender's Office.  I don't have last names.  All I've got at this point is first names with theoretically information coming to me about who they are and how we locate them.  Point being . . . this is gonna require some preparation obviously.

(Supplemental Transcript of May 30, 2018 Hearing, Vol. 2 at 7-8).

[15]     Flowers asked "[h]ow long [was he] supposed to sit" and if he was "supposed to give [defense counsel] a year or two (2) to get ready for something that he should be ready . . . for[.]"  (Supplemental Transcript of May 30, 2018 Hearing, Vol. 2 at 11).  The trial court responded that defense counsel was "not asking for a year or two (2) years to get ready."  (Supplemental Transcript of May 30 Hearing, Vol. 2 at 11).  The trial court further explained that defense counsel was "asking for a reasonable amount of time to review all of the discovery, to take the depositions that [Flowers was] requesting that he take of witnesses that [Flowers] ha[d] not yet identified for him other than by a first name."  (Supplemental Transcript of May 30 Hearing, Vol. 2 at 11).  The trial court also told Flowers that defense counsel was "a very good lawyer, but he [could not]

magically create people out of nothing without more information."
(Supplemental Transcript of May 30 Hearing, Vol. 2 at 11).

[16] Thereafter, the parties and the trial court discussed the State's motion to continue. The trial court asked the State if its October 1 through October 3 trial "would really go to trial as scheduled." (Supplemental Transcript of May 30, 2018 Hearing, Vol. 2 at 15). The State responded that it was "doing [its] depositions . . . and expect[ed] the DNA to be back . . . soon." (Supplemental Transcript of May 30, 2018 Hearing, Vol. 2 at 15). The State further stated that it did not "know of a reason why there would be a delay from [those dates] at this point. . . . [I]n [its] estimate . . . from the communication with the defense attorney there that [they] both anticipate[d] this [would] be a trial." (Supplemental Transcript of May 30, 2018 Hearing, Vol. 2 at 15).

[17] In June 2018, the trial court issued an order granting the State's motion to continue Flowers' trial. One month later, in July 2018, Flowers, attempting to act pro se, filed a handwritten motion to dismiss based in part on his alleged denial of his right to a speedy trial. The following week, the trial court issued an order "tak[ing] no action on [Flowers'] pro se pleading as he is represented by counsel." (Chronological Case Summary, July 31, 2018 entry).

[18] In October 2018, defense counsel filed a motion to continue the trial to allow him to take depositions of "essential witnesses" that had previously been unavailable. (Chronological Case Summary, October 11, 2018 entry). One of the witnesses was Rolan, "who ha[d] recently been transported by the United

States Marshal Service from an out-of-state jurisdiction." (Chronological Case Summary, October 11, 2018 entry). Defense counsel also requested the continuance "to obtain the services of a forensic sciences consultant to review the videotape of the crime scene and event." (Chronological Case Summary, October 11, 2018 entry). Following a hearing, the trial court granted defense counsel's motion to continue and rescheduled Flowers' trial for December 11 through December 13, 2018.

[19] Flowers' jury trial began as rescheduled in December 2018. At trial, Rolan was shown State's Exhibit 2, which was a still photograph taken from video footage of the shooting. Rolan identified Flowers as the man wearing the hooded sweatshirt with the hood pulled up over the back of his head. Flowers was standing in the entrance to Building 2A. Rolan identified Voss as the man who was falling to the ground. In addition, Rolan identified himself as the man standing next to Voss as he fell to the ground. Rolan testified that he saw Flowers shoot Voss in the face.

[20] Also at trial, the State presented evidence that Voss had sustained a gunshot wound to his left facial cheek. After entering Voss' cheek, the bullet had followed a downward trajectory and had torn through the "high cervical" portion of Voss' spinal cord before coming to rest at the base of his neck. (Tr. Vol. 3 at 131, 147). This type of spinal cord injury would have caused "near immediate death" because it affected those parts of the nervous system that were connected to the "respiratory centers" and the "heartrate centers" of the brain. (Tr. Vol. 3 at 134). The physician that performed Voss' autopsy

removed the bullet from Voss' neck and determined that Voss' cause of death was a homicide. The specific cause of death was a "gunshot wound of the head." (Tr. Vol. 2 at 146).

[21]     In addition, the evidence at trial revealed that the police had never recovered a murder weapon. However, a forensic analyst testified that a combination of the bullet removed from the base of Voss' neck and the shell casing found at the scene of the murder could only have come from either a Glock, which Flowers regularly carried, or a Smith & Wesson.

[22]     Sergeant Strausborger testified that the security camera system at the Villages of Hanna was a Network Video Recorder and that each cluster of buildings had a recording camera. Sergeant Strausborger testified that he knew "where the cameras were placed . . . throughout the complex and the angles in which all of the cameras would capture." (Tr. Vol. 2 at 231). According to Sergeant Strausborger, every camera in the apartment complex was on a uniform timer and the time stamps on the video footage were "uniform throughout [the] complex." (Tr. Vol. 2 at 225). Sergeant Strausborger further explained that the location of each camera in the Villages of Hanna was displayed in the bottom right corner of the video. In addition, according to Sergeant Strausborger, the video cameras recorded footage as frame-by-frame stills or in an "incident sequence." (Tr. Vol. 2 at 223). Sergeant Strausborger likened the video from the recorders to a "reel movie" and "Walt Disney Mickey Mouse" cartoons. (Tr. Vol. 3 at 14, 16). This incident sequence caused the video cameras to jump one second and a half to two seconds between frames, depending on the

location of the camera in question. This "jump[ing]" left gaps of one and one-half to two seconds in the videos. (Tr. Vol. 3 at 226).

[23] Sergeant Strausborger further testified that all of the cameras had an infrared filter. According to Sergeant Strausborger, if there was not enough ambient light, the infrared filter shot out an infrared light that helped capture the image. When the infrared light was activated, the video was black and white. However, if there was enough ambient light, the video was in color.

[24] During the State's direct examination of Sergeant Strausborger, the State admitted into evidence State's Exhibits 16 through 19. State's Exhibit 16 is a DVD that contains a series of nine videos from the cameras placed throughout the apartment complex that had been looped together into one video. The video shows the confrontation between Flowers and Voss as well as the shooting. The video also shows Flowers running through the apartment complex to his van and includes videos of Flowers raising his hand and making a gesture with his index and pinky fingers up and his middle and ring fingers down with his thumb as well as smoking a cigarette and tossing the cigarette butt onto the ground. The video also shows Flowers getting into his van in the parking lot and driving away with his lights off and subsequently driving around the Villages of Hanna and parking in different areas of the complex as emergency vehicles respond to the scene of the shooting. Strausborger twice reviewed the video footage in State's Exhibit 16 a few days before trial. He then signed and dated the DVD to which it was saved.

[25] State's Exhibits 17 through 19 are taken from State's Exhibit 16. Specifically, State's Exhibit 17 is a DVD with eighty-five still images from the video recording of the confrontation between Flowers and Voss and the shooting as seen in State's Exhibit 16. State's Exhibit 18 includes forty-five still frame-by-frame photographs taken from the images contained in State's Exhibit 17 and taken from State's Exhibit 16. State's Exhibit 19 consists of close up still frame-by-frame photographs of the images contained in State's Exhibit 18. Flowers did not object to the admission of Exhibits 16 through 19 into evidence.

[26] During its direct examination of Sergeant Strausborger, the State played State's Exhibit 16 for the jury and asked Sergeant Strausborger about his initial observations the first time that he had watched the video of the confrontation between Flowers and Voss and the subsequent shooting of Voss. Sergeant Strausborger responded that Flowers' mannerisms, "the way that [Flowers'] arm was moving, . . . led [Sergeant Strausborger] to believe through [his] experience and . . . training and everything that that individual had a . . . gun in his hand." (Tr. Vol. 2 at 231). When the State asked Sergeant Strausborger to explain the specific mannerisms to which he was referring, defense counsel objected. Defense counsel specifically explained that he was "objecting to [the sergeant's] description of what we see in the videos, or the pictures, or the frames. They speak for themselves[.] [I]t's inappropriate for him to be describing to the Jury his interpretation of what is seen in the video or any of the still pictures." (Tr. Vol. 2 at 232).

[27] The State responded that it could:

ask [Sergeant Strausborger] about how the person, . . . as they're holding a gun, and . . . recoil, things like that. I can certainly do that to lead up to it[.] But if I need to lay a few additional foundational questions . . he can describe based on . . . at a minimum as a . . . learned or skilled witness to be able to describe how recoil happens in a one-handed shooting and why it is that . . . from his view why that was significant.

(Tr. Vol. 2 at 232).

[28] Defense counsel agreed that it was:

> appropriate to ask in a general sense questions about what happens when someone fires a weapon . . . in a general sense about Glocks and their description and things like that. But . . . if he drifts into a description and saying . . . and in essence testifying to the Jury that is what we're seeing in this video, then that's his interpretation of it, the I think . . . that that's inappropriate[.]

(Tr. Vol. 2 at 232).

[29] The trial court told the parties that "[t]hat [was] the ultimate question for the jury." (Tr. Vol. 2 at 233). The State responded that it would "return to that topic in a moment." (Tr. Vol. 2 at 234). Thereafter, the State asked Sergeant Strausborger general questions about the layout of the Villages of Hanna and its surrounding streets. In addition, the State questioned Sergeant Strausborger about one-handed shooting and its resulting recoil. Sergeant Strausborger explained that "the way that you're holding the weapon is gonna kind of equate to the amount of recoil that you'll have with the weapon." (Tr. Vol. 2 at 244).

[30] During cross-examination, defense counsel asked Detective Strausborger whether "if it were like nighttime conditions, . . . would you typically see a muzzle flash or a flash or an explosion coming from the end of the barrel of the gun?" (Tr. Vol. 3 at 12). Sergeant Strausborger responded that "you do sometimes. Uh, you don't always . . . and I know this from my own personal experience in shooting in no light. . . . [T]ypically you would because of that explosion . . . but I can say I don't see it every single time that I shoot." (Tr. Vol. 3 at 12). Sergeant Strausborger also agreed that "[s]ometimes a flame comes out the end" of the gun's barrel. (Tr. Vol. 3 at 13).

[31] Defense counsel then questioned the sergeant about the security camera video footage of the altercation between Flowers and Voss and the shooting. Defense counsel asked Sergeant Strausborger whether "[i]n the frame by frame images that are . . . creating this video, things are going to happen that are not seen on the . . . individual frames." (Tr. Vol. 3 at 14). Sergeant Strausborger responded that, "[i]n this specific video I would say yes, that is accurate." (Tr. Vol. 3 at 14). Defense counsel's question and Sergeant Strausborger's response appear to have been based on the fact that there was a one and one-half to two second delay in the recording.

[32] During re-direct examination, the State asked Sergeant Strausborger to look at eleven of the close-up still photographs, which were included in State's Exhibit 19 and which depicted the shooting. Defense counsel objected that the State was "exceeding the scope of cross examination [because] [t]here wasn't any cross examination as to particular . . . still photos. Cross examination was in a

general sense about . . . the . . . spacing that occurs in . . . this type of camera." (Tr. Vol. 3 at 17). The State responded that defense counsel "was specifically asking about what might not be in there, that is that there were gaps in sequences. And I'm trying to clarify that. And . . . with the suggestion there are things they might not see in it." (Tr. Vol. 3 at 17).

[33] After the trial court overruled Flowers' objection, defense counsel again argued that Sergeant Strausborger's testimony "exceed[ed] the scope of cross examination." (Tr. Vol. 3 at 18). The trial court responded that the sergeant's testimony was "within the scope of your cross examination." (Tr. Vol. 3 at 18). Defense counsel responded that it was his "position . . . that where [the State] want[ed] to go with this as [he was] listening to what [the State] intend[ed] to do, it greatly exceed[ed] . . . what [defense counsel was] talking about in cross examination. Now we're getting into this particular event and him describing what the Jury is going to be seeing in the video or the still photos themselves." (Tr. Vol. 3 at 18-19). The trial court told defense counsel that it had already overruled his "objection on the scope of cross examination. You brought up the – the specific areas of the video that you're claiming that there's things that aren't being seen that this witness can testify that are being seen. I'm gonna overrule the objection and allow the testimony." (Tr. Vol. 3 at 19).

[34] Thereafter, Sergeant Strausborger testified that in photograph 64, Flowers was in a confrontational position and appeared to be face to face with Voss. Sergeant Strausborger further testified that based on his training related to firearms, he believed that a firearm was being discharged between photographs

64 and 65 because of Flowers' hand positioning and the recoil that would have happened. In addition, Sergeant Strausborger testified that in photograph 65, Voss spun to his right, which would have been consistent with the force produced from a firearm. In addition, Sergeant Strausborger testified that it appeared in photograph 67 as though Flowers was still holding the gun because his "fingers [were not] splayed out that it [was] actually more in a fist as though it [was] holding something." (Tr. Vol. 3 at 23).

[35] During closing argument, defense counsel returned to the one and one-half to two second gaps in the video when he argued as follows:

> These photos are snip-its of a second, distance between these pictures that you look at, 1.8 to 2 seconds. So you're not looking at continuous flow as if I'm walking around like this. You're seeing bits and pieces 2 seconds apart. What can happen in 2 seconds? It's Saturday night, you're at the Forum, Los Angeles, Lakers and the Pacers, Pacers one point ahead, 2 seconds left in the game, Lakers got the ball out of bounds half-court, pass into Lebron James. Lebron James gives a slight little fake to the left to get the defender going that way, dribble to the right, up he goes in all his majestic height he releases the ball twenty-five (25) feet out, it goes through the air, down through the net, the horn sounds, the game is over, fans rush out onto the stands (sic) - or out onto the floor. Lakers won, Lakers won. A lot happened in 2 seconds. In the meantime, there's a photographer courtside and as the ball enters into the hoop and swooshes the net you take a pic (sic) — he takes a picture, and you see the backboard, and you see the ball going through the rim swishing the net and the shot clock is down to .1 or 0 and it's all happened in 2 seconds. You're not so lucky, you live in Fort Wayne, Indiana. It's a little darker, it's a little glummer, it's a little colder than it is in Los Angeles. Next morning you pick up your paper as you're having

your coffee. And you open up the paper and there's a picture, a snip-it of time. And that picture is a ball - a basketball going through the hoop, shot clock is down and the headline is Lakers win. You're disappointed, but you don't know what happened. You see the picture, but how did this happen. You got to read the story. What happened in that last 2 seconds? How did that ball go through the hoop and the Laker's won the game, huh? You got to rely upon what the reporter tells you happened in those 2 seconds. The reporter the State is asking you to rely on is Javon Rolan.

(Tr. Vol. 4 at 218-19).

[36]    During the State's closing argument, the State argued that Flowers' run through the Villages of Hanna after the shooting was "nothing but a victory lap." (Tr. Vol. 3 at 214). The State pointed out that Flowers had raised his hand and made a gesture with his index and pinky fingers up and his middle and ring fingers down with his thumb. The State argued that Flowers was celebrating the fact that he had shot Voss.

[37]    Following the three-day trial, the jury convicted Flowers of murder. In a separate proceeding, the jury found that the State had proved the elements of the use-of-a-firearm enhancement beyond a reasonable doubt.

[38]    At Flowers' January 2019 sentencing hearing, Flowers, who had not testified at trial, told the trial court that he had been wrongly convicted and that Rolan had killed Voss. He also explained that when he was running through the Villages of Hannah after the shooting, "[he] was running out of fear and showing a hand

signal to [indicate] [he] had no gun in order to prevent being falsely accused."
(Tr. Vol. 3 at 246).

[39] Also at the sentencing hearing, the State responded as follows to Flowers' claim that he had been running out of fear:

> [T]his was really a victory lap. He was proud of what he had just done. Um, there is no disputing that the person raising their hand doing those things is the Defendant. Um, that was not anywhere in any, um, matter of dispute. If that's the case then if the Defendant's allocution today, uh, is that it was not him, then he somehow still celebrating this guy just getting shot in front of him just now. Either way, it doesn't make any sense. But it actually makes the most sense and that he's proud of what he had just done. He was celebrating that he was getting away with it. Because as the Court then recalls the rest of the path that is shown in 1 that has the video is that what he did is he went out to his vehicle, he slowly backed out of the parking space, lights off, drove around, went over to that other spot across the street, and he sat there and waited with his lights off. Sat there and waited. And you could actually see him looking forward, back, and forward in the vehicle as all the squad cars rushed in. He was waiting on them to do that and then he - once they were passed, including the ambulance, he then backs out and drives off in the opposite direction of where this was. This wasn't a friend of his that he feels sorry for that was killed. This is he was getting away with it and driving away as the evidence clearly showed.

(Tr. Vol. 4 at 8).

[40] The State also presented evidence at the sentencing hearing that Flowers has an extensive criminal history that includes juvenile delinquency adjudications in Illinois for attempted burglary and possession of a controlled substance, both of

which would have been felonies if committed by an adult. Flowers also has four prior felony convictions for: (1) receiving, possessing, or selling a stolen vehicle in Illinois; (2) robbery while armed with a firearm in Illinois; (3) battery to a police officer in LaPorte County, Indiana; and (4) resisting law enforcement in Starke County, Indiana. In addition, Flowers has four misdemeanor convictions, including three reckless driving convictions and one battery conviction, all in LaPorte County, Indiana. Flowers' parole was revoked twice in Illinois, and his probation was revoked once in Indiana.

[41] Also at the sentencing hearing, the State asked the trial court to order Flowers to pay $5,000 in restitution to the Indiana Criminal Justice Institute ("the ICJI"). The State specifically explained that the ICJI "had provided . . . assistance to the . . . victim's family that were out of state to take care of funeral expense and having to bring his body from Fort Wayne to their . . . home." (Tr. Vol. 4 at 10). Section four of Flowers' PSI states that "[t]he victim, [ICJI] Victims of Violent Crime Compensation, is requesting restitution in the amount of $5,000.00 for reimbursement of the claim paid to [Voss' family] for funeral expenses." (App. Vol. 2 at 62). In addition, a restitution response form attached to Flowers' PSI listed the ICJI as a victim and requested $5,000 in restitution to reimburse the ICJI for the money that it paid to Voss' family for funeral expenses. The form also revealed that "Sheri LeFebvre, Victim Services Coordinator, Allen County Adult Probation, [had] phoned [the ICJI] and confirmed this loss." (App. Vol. 2 at 71).

[42] At the end of the sentencing hearing, the trial court found Flowers' extensive criminal history to be an aggravating factor. The trial court specifically stated as follows:

> The Court does find as an aggravating circumstance your prior criminal record with failed efforts at rehabilitation and the fact that you are a multi-county multi-state offender with convictions in Indiana and Illinois. Here in Indiana you've got convictions in LaPorte County, Stark[e] County, and Allen County. Your criminal record covers a period of time from 1998 to 2018 with two (2) adjudications as a juvenile where you were given the benefit of probation and community service, and then ultimately the Illinois Youth Center commitment. As an adult you have four (4) misdemeanor convictions and four (4) prior felony convictions, all as reflected in the Presentence Investigation Report and as argued by the State of Indiana. You have been given short jail sentences, longer jail sentences, time in the Department of Correction. You've been placed on parole. You've been placed on probation. You've been given the benefit of community corrections. Your probation has been modified once. Your probation has been revoked once, and your parole has been revoked twice, albeit in one case.

(Tr. Vol. 4 at 12-13).

[43] The trial court found no mitigating circumstances and sentenced Flowers to sixty-five (65) years for murder, enhanced by twenty (20) years for his use of a firearm during the murder. The trial court also ordered Flowers to "make restitution to the Indiana Criminal Justice Institute for the funeral expenses in the gross amount of five thousand dollars ($5,000.00)." (Tr. Vol. 4 at 13).

[44] Flowers now appeals his conviction and sentence.

# Decision

Flowers argues that the trial court abused its discretion when it: (1) granted the State's motion to continue Flowers' trial; (2) admitted evidence; and (3) ordered Flowers to pay $5,000 in restitution; and that (4) his eighty-five (85) year sentence is inappropriate in light of the nature of the offense and his character. We address each of his contentions in turn.

## 1. Motion to Continue

As a preliminary matter, we note that Flowers' first argument is that "he was entitled to discharge since the trial court failed to set [his] trial within seventy (70) days of his request for a fast and speedy trial, and instead, continued his trial date." (Flowers' Amended Br. 17). However, if a defendant is represented by counsel, the defendant speaks to the trial court through that counsel. *Hill v. State*, 773 N.E.2d 336, 342 (Ind. Ct. App. 2002). The trial court is not required to respond to the defendant's objections or motions because "[t]o require the trial court to respond to both Defendant and counsel would effectively create a hybrid representation to which Defendant is not entitled." *Underwood v. State*, 722 N.E.2d 828, 831 (Ind. 2000). *See also* Indiana Trial Rule 11 (stating that "[e]very . . . motion of a party represented by an attorney shall be signed by at least one (1) attorney of record[.]"). Here, because Flowers was represented by counsel when he wrote letters to the trial court requesting a speedy trial, the trial court was not required to grant Flowers' request to proceed with a speedy

trial.[2]  *See Hill*, 773 N.E.2d at 342 (holding that "[b]ecause Hill was represented by counsel, the trial court was not required to grant Hill's request to proceed with a speedy trial").  We therefore need not address this issue.  Rather, we will address Flowers' related argument that the trial court abused its discretion when it granted the State's motion to continue.

[47]  The grant or denial of a motion to continue is within the trial court's broad discretion.  *Tharpe v. State*, 955 N.E.2d 836, 843 (Ind. Ct. App. 2006), *trans. denied*.  An abuse of discretion occurs when the ruling is against the logic and effect of the facts and the circumstances before the court or where the record demonstrates prejudice from the denial of the continuance.  *Id.*

[48]  Here, Flowers argues that "while inconvenient, the deputy prosecuting attorney was not going to be in trial the week of September 25 through September 27, 2018, but merely preparing for trial and handling pretrial motions.  The State should have attempted to reschedule the pre-trial issues that may have resulted in conflicts with scheduling."  (Flowers' Br. 22).  However, Flowers did not make this argument at the hearing on the State's motion to continue.

[49]  The Indiana Supreme Court has explained that:

---

[2] We note that this case exemplifies the reason for the rule that a defendant who is represented by counsel speaks to the court through that counsel.  Specifically, although Flowers had sent the trial court written requests for a speedy trial, defense counsel explained that he had had two conversations with Flowers about the concept of a speedy trial.  Defense counsel further explained, as set forth above, that this was not a case where a speedy trial was an appropriate strategy.

> [A] trial court cannot be found to have erred as to an . . .
> argument that it never had an opportunity to consider.
> Accordingly, as a general rule, a party may not present an
> argument . . . on appeal unless the party raised that argument . . .
> before the trial court. In such cases the argument is waived.

*Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004) (internal citations omitted).
Here, because Flowers did not make the attempted rescheduling argument to
the trial court, he was waived our consideration of this argument on appeal.

## 2. Admission of Evidence

Flowers also argues that the trial court abused its discretion in admitting
evidence. The admission of evidence is within the sound discretion of the trial
court, and we will reverse only for an abuse of that discretion. *Rogers v. State*,
897 N.E.2d 955, 959 (Ind. Ct. App. 2008), *trans. denied*. A trial court abuses its
discretion if its decision is clearly against the logic and the effect of the facts and
circumstances before the court or if the court has misinterpreted the law. *Id.*
Flowers specifically contends that the trial court erred in admitting Exhibits 16
through 19 as well as specific testimony of Sergeant Strausborger. We address
each of his contentions in turn.

## A. Exhibits 16 through 19

At the outset, we note that Flowers failed to object to the admission of Exhibits
16 through 19 at trial. He has therefore waived appellate review of this issue.
*See Palilonis v. State*, 970 N.E.2d 713, 730 (Ind. Ct. App. 2012), *trans. denied*,

(explaining that in order to preserve an issue for appeal, a contemporaneous objection must be made when the evidence is introduced at trial).

[52] Waiver notwithstanding, we find no error. Flowers specifically argues that the trial court abused its discretion when it admitted these exhibits "without requiring any foundation to establish their accuracy or authenticity." (Flowers' Amended Br. 15). The State responds that the exhibits were admissible under the "silent witness" theory. (State's Br. 32). We agree with the State.

[53] The "silent witness" theory permits the admission of surveillance footage as substantive rather than merely demonstrative evidence. *McCallister v. State*, 91 N.E.3d 554, 561 (Ind. 2018). For evidence to be admitted for that purpose, there must a strong showing of authenticity and competency. *Id*. at 562. Authenticating witnesses are not required to testify that video footage is a true and accurate representation of a scene. *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014), *cert. denied*, 574 U.S. 1091 (2015). Rather, they must "give identifying testimony of the scene that appears in the photographs, sufficient to persuade the trial court of their competency and authenticity to a *relative certainty*." *Id*. (emphasis in the original).

[54] In the *McCallister* case, which Flowers did not cite in his appellate brief, the Indiana Supreme Court provided guidance regarding the evidence necessary to satisfy the foundational requirements to admit silent witness evidence. Therein, during McCallister's murder trial, the trial court admitted into evidence hotel lobby video surveillance that showed McCallister's accomplices walking

through the lobby with the murder victim and then later returning to the hotel without him. A jury subsequently convicted McCallister of murder, and the trial court sentenced him to life without parole.

[55] On appeal, McCallister contended that the trial court had abused its discretion when it admitted the surveillance video. McCallister specifically argued that the State had not laid an adequate foundation for its admissibility because the hotel manager who testified about the hotel's surveillance system was not employed at the hotel when the video had been taken.

[56] The Indiana Supreme Court noted that although the hotel manager had not worked at the hotel at the time of the murder and was not able to say with certainty that the DVD contained accurate footage of the lobby on the date of the murder, the hotel manager authenticated the video in several important respects. *McCallister*, 91 N.E.3d at 562. First, the hotel manager testified that the video system affixed an accurate date and time stamp that was attuned to accepted time and that was reset in January of each year to ensure accuracy. *Id*. The hotel manager also recognized the furniture in the lobby and the employees shown in the video. *Id.* In addition, the hotel manager testified that the surveillance system was always on and that the videos were backed up to a cloud, which meant that they were saved to external servers accessible to the hotel's managers through the internet. *Id.* Our supreme court held that these verifications, along with a police officer's testimony that he had obtained the DVD with the surveillance video from the hotel within days after the murder

victim's body had been found, provided sufficient grounds for the trial court to have admitted the video. *Id.*

[57] Here, as in *McCallister*, Sergeant Strausborger authenticated State's Exhibit 16, as well as State's Exhibits 17, 18, and 19, which had all been taken from State's Exhibit 16, in several important respects. Specifically, Sergeant Strausborger, who arrived at the scene immediately after Voss' murder to investigate the homicide, was the security director for the company that owns the Villages of Hanna. Sergeant Strausborger testified that he understood how the video security system worked, knew that there was a camera focused on building 2A, and accessed footage from the security camera that had recorded Voss' murder.

[58] In addition, Sergeant Strausborger testified that the security system was a Network Video Recorder and that each cluster of apartment buildings had a recording camera. Sergeant Strausborger further testified that he knew where all of the cameras were placed in the complex and the angles that all of the cameras would capture. The sergeant testified that he was therefore able to access video footage of Flowers running through the Villages of Hanna after the shooting. In addition, the sergeant testified that every camera was on a uniform timer and that the time stamps on the video footage were uniform throughout the complex. Sergeant Strausborger also testified that the location of each camera in the Village of Hanna was displayed in the bottom right corner of the video. Sergeant Strausborger further testified that the video cameras recorded footage in frame-by-frame stills. In addition, the sergeant testified that he had twice reviewed the footage in State's Exhibit 16 a few days before trial.

Sergeant Strausborger further testified that he then signed and dated the DVD to which it had been saved. This evidence provided sufficient grounds for the trial court to have admitted the video, and we find no abuse of the trial court's discretion.[3]

## B. Testimony of Sergeant Strausborger

[59] Flowers also argues that the trial court abused its discretion when it "allowed Strausborger to testify, over objection, on his opinion regarding the contents of State's Exhibits 16 through 19, and what he believed they showed." (Flowers' Amended Br. 30). According to Flowers, "[Sergeant] Strausborger's testimony was not the best evidence of the contents of the exhibits and should have been excluded." (Flowers' Amended Br. 31). The State responds that "the statements Flowers now challenges on appeal [were] admissible . . . because Flowers opened the door to them during his cross-examination of Sergeant Strausborger." (State's Br. 40). We agree with the State.

[60] Assuming, without deciding, that this evidence was inadmissible, we note that "[o]therwise inadmissible evidence may be admitted where the defendant opens

---

[3] We further note that Flowers' fundamental error argument fails. The fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes a procedural default precluding consideration of the issue on appeal. *Palilonis*, 970 N.E.2d at 730. In order to be fundamental, the error must represent a "blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process." *Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012). "Harm is not shown by the fact that the defendant was ultimately convicted; rather harm is found when error is so prejudicial as to make a fair trial impossible." *Id.* Further, this exception is available only in egregious circumstances. *Palilonis*, 970 N.E.2d at 730. Here, Flowers has failed to show how the admission of Exhibits 16 through 19 made a fair trial impossible and why the circumstances in this case were egregious.

the door to questioning on that evidence." *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009). "The door may be opened when the trier of fact has been left with a false or misleading impression of the facts." *Id.*

[61] Here, during cross-examination, defense counsel asked Sergeant Strausborger specific questions about the content of the photographs of the altercation between Flowers and Voss and the shooting of Voss. We agree with the State that defense "counsel [was] attempt[ing] to cast doubt as to whether the individual who had previously been identified as Flowers in the video fired a gun by asking, '[i]n the frame by frame images . . . that are creating this video, things are going to happen that are not seen on . . . the individual frames, would that be accurate?'" (State's Br. 40) (quoting Tr. Vol. 3 at 14). We also agree that defense counsel opened the door to Sergeant Strausborger's subsequent testimony during redirect examination regarding what he had seen both before and after the gaps in the recording that would have explained what had happened during the gaps.

[62] For example, Sergeant Strausborger testified that in photograph 64 of State's Exhibit 19, Flowers was in a confrontational position and appeared to be face to face with Voss. Sergeant Strausborger further testified that based on his training related to firearms, he believed that a firearm had been discharged between photographs 64 and 65 because of Flowers' hand positioning and the recoil that would have happened. In addition, Sergeant Strausborger testified that in photograph 65, Voss spun to his right, which would have been consistent with the force produced from a firearm. Because defense counsel opened the

door to this testimony, the trial court did not abuse its discretion in admitting it into evidence.[4]

## 3. Restitution

[63] Flowers also argues that the trial court abused its discretion in ordering Flowers to pay $5,000 in restitution to the ICJI. Flowers specifically argues that the evidence submitted at his sentencing hearing concerning the victim's loss was insufficient to support the trial court's order of restitution.

[64] The trial court has the authority to order a defendant who is convicted of a crime to make restitution to the victim of the crime. INDIANA CODE § 35-50-5-3(a). "[T]he issuing court may order the [defendant] to pay the restitution . . . directly to . . . the Indiana criminal justice institute in an amount not exceeding. . . the amount of the award." I.C. § 35-50-5-3(c)(1)(A). The trial court "shall base its restitution order upon a consideration of . . . funeral, burial, or cremation costs incurred by the family . . . of a homicide victim as a result of the crime." I.C. § 35-50-5-3(a)(5).

---

[4] In a related argument, Flowers argues that the trial court abused its discretion when it improperly "allowed [Sergeant Strausborger] to testify on [the ultimate issue of Flowers'] guilt and arrive at a legal conclusion" by testifying during the State's redirect examination that the individual wearing the hoodie was the shooter. (Flowers' Amended Br. 34). However, Flowers has waived appellate review of this issue because he failed to object to Sergeant Strausborger's testimony on ultimate issue grounds during the State's redirect examination at trial. *See Palilonus*, 970 N.E.2d at 730. Waiver notwithstanding, we find no error. We agree with the State that "Sergeant Strausborger expressed no opinion as to the ultimate issue of whether Flowers was guilty of murder." (State's Br. 44).

[65]    A restitution order is within the trial court's discretion, and we will reverse only upon a showing of an abuse of that discretion. *Long v. State*, 867 N.E.2d 606, 618 (Ind. Ct. App. 2007). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* In determining whether the trial court abused its discretion, we will not reweigh the evidence. *Mogg v. State*, 918 N.E.2d 750, 755 (Ind. Ct. App. 2009). We will affirm the trial court's decision if there is any evidence supporting it. *Smith v. State*, 990 N.E.2d 517, 520 (Ind. Ct. App. 2013), *trans. denied*. "Evidence supporting a restitution order is sufficient 'if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture.'" *S.G. v. State*, 956 N.E.2d 668, 683 (Ind. Ct. App. 2011) (quoting *T.C. v. State*, 839 N.E.2d 1222, 1227 (Ind. Ct. App. 2005)), *trans. denied*.

[66]    Here, our review of the evidence reveals that the State asked the trial court to order Flowers to pay $5,000 in restitution to the ICJI. The State specifically explained that the ICJI "had provided . . . assistance to the . . . victim's family that were out of state to take care of funeral expense and having to bring his body from Fort Wayne to their . . . home." (Tr. Vol. 4 at 10). Section four of Flowers' PSI states that "[t]he victim, [ICJI] Victims of Violent Crime Compensation, is requesting restitution in the amount of $5,000.00 for reimbursement of the claim paid to [Voss' family] for funeral expenses." (App. Vol. 2 at 62). In addition, a restitution response form attached to Flowers' PSI listed the ICJI as the victim and requested $5,000 in restitution to reimburse the

ICJI for the money that it paid to Voss' family for funeral expenses. The form also revealed that "Sheri LeFebvre, Victim Services Coordinator, Allen County Adult Probation, [had] phoned Indiana Criminal Justice Institute and confirmed this loss." (App. Vol. 2 at 71). This evidence "affords a reasonable basis for estimating [the ICJI's] loss and does not subject the trier of fact to mere speculation or conjecture." *See S.G.,* 956 N.E.2d at 683. The trial court did not abuse its discretion in ordering Flowers to pay $5,000 in restitution.[5]

---

[5] Flowers' reliance on *Iltzsch v. State*, 972 N.E.2d 409 (Ind. Ct. App. 2012), *vacated in part on other grounds*, *Iltzsch v. State*, 981 N.E.2d 55 (Ind. 2013), is misplaced. In *Iltzsch*, the victim entered his house to find Iltzsch standing in the victim's kitchen. When the victim told Iltzsch to leave, Iltzsch fled. After Iltzsch had left, the victim noticed that his television, which had been on his kitchen counter, was lying screen-down on the floor. The victim also found a BB gun, beer from his refrigerator, and a few other small items in a trash bag in his kitchen. After convicting Iltzsch of Class B felony burglary and adjudicating him to be an habitual offender, the trial court sentenced Iltzsch to twelve years enhanced by ten years and ordered him to pay the victim $711.95 in restitution. The restitution order was based solely on the victim impact statement written by the probation officer who had prepared Iltzsch's pre-sentence investigation report. In the statement, the probation officer indicated that the victim had informed her that nothing had been taken during the burglary. However, the victim had told the probation officer that Iltzsch had destroyed his antique record collection that was worth approximately $300 and that his television had to be replaced and the loss was $411.95.

On appeal, Iltzsch argued that the trial court abused its discretion in ordering him to pay $711.95 because the evidence submitted at his sentencing hearing was insufficient to support the trial court's order of restitution. This Court agreed with Iltzsch. Specifically, we explained that the only evidence supporting the restitution order was "the probation officer's secondhand account of [the victim's] bare, unsworn assertions that his property had been damaged and that his total loss was $711.95, without any supporting documentation or testimony, and without any explanation of how the property was damaged or how [the victim] had arrived at these valuations." *Id*. at 413-14. We therefore concluded that the trial court had abused its discretion in entering the restitution order.

However the facts in *Iltzsch* are distinguishable from those in the case before us. Here, the State explained that the ICJI, which is specifically named in the restitution statute, had provided assistance to the victim's family for funeral expenses. In addition Flowers' PSI provides that the ICJI Victims of Violent Crime Compensation Fund was requesting reimbursement in the amount of $5,000 for the claim paid to the victim's family for funeral expenses. Lastly, a restitution response form attached to Flowers' PSI listed the ICJI as a victim requesting $5,000 in restitution for money that it had paid to the victim's family for funeral expenses. The form also revealed that the Allen County Adult Probation Victim Services Coordinator had confirmed the loss with the ICJI. The restitution order in this case is supported by an explanation of the services and how the ICJI arrived at its valuation. In addition, the claim for restitution was confirmed with the ICJI. We find no abuse of the trial court's discretion.

### 4. Inappropriate Sentence

[67] Flowers also argues that his eighty-five (85) year sentence, which includes a sixty-five (65) year sentence for murder, enhanced by twenty (20) years for the use of a firearm, was inappropriate. Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. The defendant bears the burden of persuading this Court that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on the "culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[68] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. Here, Flowers was convicted of murder and he was found to have knowingly or intentionally used a firearm during the commission of the offense. The sentencing range for murder is from forty-five (45) to sixty-five (65) years, with an advisory sentence of fifty-five (55) years. I.C. § 35-50-2-3. In addition, if a person knowingly or intentionally uses a firearm during the commission of certain offenses, including murder, the trial court may impose an additional fixed term of imprisonment between five and twenty years. I.C. § 35-50-2-11. Here, the trial court imposed a sixty-five (65) year sentence for Flowers' murder

conviction, enhanced by twenty (20) years for his use of a firearm, resulting in an aggregate sentence of eighty-five (85) years.

[69] With regard to the nature of the offense, during a verbal altercation with an unarmed Voss, who had a beer bottle in each hand and who kept his hands at his sides during the entire altercation, Flowers loaded his gun and shot Voss in the face. Flowers then fled from the scene when Voss collapsed to the ground. Security cameras at the Villages of Hanna captured footage of Flowers running through the apartment complex after the shooting. One of the videos shows Flowers raising his hand and making a hand gesture with his index and pinky fingers up and his middle and ring fingers down with his thumb. A few days later, Flowers "took concerted steps to cover up his crime" (State's Br. 51) when he told Rolan, who had witnessed Voss' murder, to "keep [his] mouth closed" and if police questioned him to say that he had been at the party and had heard a shot but had not seen anything. (Tr. Vol. 2 at 161).

[70] With regard to Flowers' character, we note that Flowers has an extensive multi-state and multi-county criminal history that spans twenty years and includes two juvenile delinquency adjudications for offenses that would have been felonies if committed by an adult. Flowers also has four felony convictions for: (1) receiving, possessing, or selling a stolen vehicle in Illinois; (2) robbery while armed with a firearm in Illinois; (3) battery to a police officer in LaPorte County, Indiana; and (4) resisting law enforcement in Starke County, Indiana. Flowers also has four misdemeanor convictions, two parole revocations, and one probation revocation. We agree with the State that Flowers' crimes "have

become progressively more serious and progressively more violent over time." (State's Br. 53). Flowers' extensive criminal history "reflects poorly on [Flowers'] character for the purposes of sentencing." *See Rutherford v. State*, 940 N.E.2d 1220, 1222 (Ind. Ct. App. 2011), *trans. denied*. In addition, Flowers' former contacts with the law have not caused him to reform himself. *See Jenkins v. State*, 909 N.E.2d 1080, 1086 (Ind. Ct. App. 2009), *trans. denied*.

[71] Based on the nature of the offense and his character, Flowers has failed to persuade this Court that his aggregate eighty-five (85) year sentence is inappropriate.

[72] Affirmed.

May, J., and Crone, J., concur.