# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision is not binding precedent for any court and may be cited only for persuasive value or to establish res judicata, collateral estoppel, or law of the case.



I N T H E

# Court of Appeals of Indiana



FILED

Nov 17 2025, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Carlos Bryant,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

November 17, 2025

Court of Appeals Case No.
24A-CR-2634

Appeal from the Marion Superior Court

The Honorable Marshelle Dawkins Broadwell, Judge

Trial Court Cause No.
49D07-2204-MR-10142

---

**Memorandum Decision by Chief Judge Altice**
Judges Pyle and DeBoer concur.

**Altice, Chief Judge**

## Case Summary

[1] Carlos Bryant appeals his convictions for felony murder and armed robbery, a Level 3 felony, claiming that the single larceny rule and double jeopardy prohibitions require reversal of the armed robbery conviction. In the alternative, Bryant maintains that the robbery conviction must be reversed because the trial court committed fundamental error when it did not issue a specific unanimity instruction to the jury regarding that charge, and that both convictions warrant reversal because the State failed to properly authenticate a video and photographs prior to their admission into evidence. Bryant also claims that the evidence was insufficient to support both convictions.

[2] We affirm.

## Facts and Procedural History

[3] Stephanie Szamlewski and her boyfriend, Kerwin Pollard (collectively, the Couple), bought and resold designer clothes and accessories. On occasion, the Couple—who lived in Chicago—would drive to Indiana cities to sell their merchandise.

[4] On March 5, 2022, the Couple traveled to Indianapolis in Szamlewski's 2022 Chevrolet Blazer (the Blazer) to sell some of their items. Late the next morning, the Couple drove to a barber shop that an acquaintance had recommended to sell their merchandise. After finding that the business was

closed, the Couple walked next door to a Subway restaurant (the Subway) to eat lunch.

[5] At some point, Pollard noticed two men wearing the style of clothing that he and Szamlewski were selling standing in the Subway parking lot next to a white Chevy Malibu. One of the individuals, later identified as Julius Thomas, was wearing a black Versace t-shirt with "golds" in his mouth. *Transcript Vol. III* at 204-05. The other man—subsequently identified as Bryant—was wearing a gray Nike track suit. Thomas and Bryant spoke with Pollard and sorted through the merchandise. Although neither Bryant nor Thomas purchased anything, Pollard gave them his phone number and told them to call if they changed their minds. Several surveillance cameras at the Subway captured Bryant and Thomas talking with Pollard as they talked and rummaged through the clothing.

[6] Approximately two hours after the Couple left the Subway, Bryant called Pollard. At Bryant's suggestion, the Couple returned to the Subway to again meet with him and Thomas. Shortly after the Couple arrived, Thomas asked Pollard to follow him to his girlfriend's residence so she could see the merchandise. The Couple followed Thomas and Bryant, who were driving Dejiauana Horne's white Malibu, into a nearby neighborhood around 3:00 p.m.

[7] Thomas, Bryant, and two female passengers—one of whom was Horne—exited the Malibu. Pollard displayed the merchandise in the back of the Blazer while Szamlewski stayed in the vehicle. When Szamlewski opened her door, Thomas

remarked that he "didn't know someone was in there." *Id.* at 210-11. Thomas then told Pollard that they needed to go to a different location because his brother wanted to purchase some of the items, and he again asked Pollard to follow him.

[8] While heading to the alternate location, Thomas called Antonio Wynn three times within two minutes. Ten minutes later, Thomas texted Bryant, "When we pull up I'm a bop him and we gone." *Transcript Vol. IX* at 235. Thomas turned onto Ingram Street, parked the Malibu along the curb, and Pollard parked directly behind him. At that point, Thomas and Bryant walked to the rear of a nearby residence, and Horne drove away in the Malibu.

[9] Shortly after Thomas and Bryant reappeared, a white Hyundai approached and parked down the street. A man, later identified as Wynn, exited the Hyundai and walked toward the back of the Blazer. Pollard spoke with all three men as they sorted through the clothing. Wynn moved closer to the Blazer and was watching Szamlewski, who was still seated in the vehicle.

[10] Thomas attempted to pay Pollard for some items through Cash App, but the transaction was declined. Pollard then grabbed his phone from the Blazer and while walking toward the back of the vehicle, he was shot in the torso and arm. Wynn grabbed Szamlewski as she exited the Blazer, threw her down on the street, and pointed a gun at her. Wynn drove off in the Hyundai, and Thomas and Bryant fled in the Blazer with the merchandise, Szamlewski's purse, and

her Yeezy tennis shoes. At some point, Bryant texted the mother of his children that he had just robbed someone and was on his way home.

[11] After Pollard was shot, he walked into a yard and collapsed. Szamlewski called 911, and police officers arrived at the scene at approximately 4:15 p.m. Pollard was unresponsive, so officers treated him with chest compressions until medical personnel arrived. Pollard was subsequently transported to Methodist Hospital where he later died from the single gunshot wound to the torso.

[12] Szamlewski told detectives at the crime scene that two men had stolen the Blazer and that the vehicle was equipped with OnStar technology. She explained that the two men were the same individuals they had met earlier that day at the Subway. A short time later, OnStar provided Indianapolis Metropolitan Police Department (IMPD) detectives with the vehicle's location. After finding the Blazer, police officers had it towed to a secure location where it was photographed and processed for DNA and fingerprints. Bryant's and Thomas's prints were found on the trunk, and Thomas's DNA was on the driver's side door. Police officers located a fired bullet and two cartridge cases on Ingram Street along with Pollard's blood and some of his personal items.

[13] The morning after the shooting, Thomas texted Bryant a newspaper article about the shooting. Later that day, Thomas's girlfriend, Tiana Robinson, purchased items at a Saks Fifth Avenue department store and a pair of Jordan shoes in a child's size ten at a Footlocker store with Szamlewski's credit card.

[14] Detectives connected Thomas, Bryant, and Wynn to the shooting through cell phone records and tower data, video footage from the Subway, traffic cameras, and credit card information. The continuing investigation eventually led police to Thomas's residence. Police officers searched the house and discovered, among other things, a pair of pink Yeezy tennis shoes, and a shoe box for Jordan shoes in a child's size 10. In the backyard of the residence, the detectives located several fired cartridge cases. Szmalewski identified items belonging to her and Pollard that police officers seized from Thomas's house.

[15] Approximately three weeks after Pollard's murder, Bryant sold the handgun that was used to shoot Pollard. The gun was recovered from the purchaser, and it was determined that the bullet used to kill Pollard and the cartridge casings recovered from Ingram Street were fired from the gun that Bryant had sold. Ballistics testing showed that the cartridge casings recovered from Thomas's backyard were also fired from that gun.

[16] On August 8, 2022, the State charged Bryant with felony murder and robbery resulting in serious bodily injury, a Level 2 felony, that identified Pollard as the victim. Bryant was also charged with armed robbery, a Level 3 felony, naming Szamlewski as the victim.

[17] During Bryant's jury trial that commenced on August 5, 2024, the owner of the Subway testified that in March 2022, surveillance cameras were inside and outside of the restaurant, that the cameras recorded digitally, that he was the sole individual who had access to the system, and that although he could

download videos, he could not change or alter them. He explained that the date and time were accurate on the video, that he only checked the timestamp if "something happened," and that he permitted an IMPD detective to download video from the surveillance system on March 9, 2022. *Transcript Vol. IV* at 115, 118-19. The owner further testified that State's Exhibit 13 was a true and accurate version of the video obtained from his surveillance system on March 6, and he explained that the footage is deleted after seven days. Bryant did not object to the Subway owner's testimony.

[18] The IMPD detective who retrieved the Subway video testified that he did so on March 9, 2022, and explained that the Subway had "a consumer grade digital recorder surveillance system." *Id.* at 131. The detective testified that the system worked properly and the date of the footage was correct, but that the time stamp was "off by one hour, eighteen minutes and fifty-three seconds." *Id.* The detective explained that all seven surveillance cameras at the Subway were operational, that he removed the surveillance video directly from the system by transferring the data to a thumb drive, and that he did not alter, edit, or change the video. The detective further testified that State's Exhibit 131 was a true and accurate copy of the video he recovered from the Subway, that State's Exhibits 132 through 138 were still photographs from the video, and that they were true and accurate copies from the video. Bryant did not object to the detective's testimony, and the video and still photos were admitted into evidence.

[19] Following the presentation of evidence on August 13, the trial court tendered its final instructions to the jury. It did not offer a separate and specific unanimity

instruction, and Bryant neither requested nor offered one. Bryant also did not object to the trial court's decision not to include such an instruction.

[20] The jury found Bryant guilty of felony murder, robbery resulting in serious bodily injury, a Level 2 felony that identified Pollard as the victim, and armed robbery, a Level 3 felony with Szamlewski listed as the victim. At the sentencing hearing on September 30, 2024, the trial court vacated Bryant's conviction for robbery resulting in serious bodily injury as to Pollard and sentenced Bryant to concurrent sentences of sixty-one years of incarceration for felony murder and fifteen years for the armed robbery of Szamlewski.

[21] Bryant now appeals.

## Discussion and Decision

## I. Double Jeopardy

[22] Bryant argues that his armed robbery conviction identifying Szamlewski as the victim must be vacated on double jeopardy grounds because he committed a "single offense under the single larceny rule," i.e., only one robbery. *Appellant's Brief* at 14. Bryant further contends that the armed robbery was a "lesser-included offense of felony murder." *Id.*

[23] The common law single larceny rule regarding double jeopardy prohibitions provides that "when several articles of property [were] taken at the same time, from the same place, belonging to the same person or to several persons there [was] but a single 'larceny', i.e., a single offense." *Raines v. State,* 514 N.E.2d

298, 300 (Ind. 1987). However, in *Wadle v. State,* 151 N.E.3d 227, 256 (Ind. 2020), our Supreme Court established a new test for evaluating double jeopardy claims under Indiana law. Thus, prior common law tests were subsumed into *Wadle*'s new analytical framework for evaluating statutory and common law double jeopardy claims. *Wadle*, 151 N.E.3d at 247 n.20; *see also Woodcock v. State*, 163 N.E.3d 863, 871-72 (Ind. Ct. App. 2021) (observing that the common law rules are incorporated into the *Wadle* analysis and no longer exist independently), *trans. denied*.

[24] Whether convictions violate Indiana's prohibition against double jeopardy is a question of law reviewed de novo. *Wadle*, 151 N.E.3d at 256. Substantive double jeopardy claims are presented in two principal ways: where a defendant's "single criminal act or transaction violates multiple statutes with common elements and harms one or more victims," or where "a single criminal act or transaction violates a single statute but harms multiple victims." *Wadle*, 151 N.E.3d at 247; *Powell v. State*, 151 N.E.3d 256, 264 (Ind. 2020). *Powell* applies only when "a single statute" is violated. *Powell*, 151 N.E.3d at 264.

[25] Here, because Bryant was convicted of violating two separate statutes—felony murder and robbery—the first type of substantive double jeopardy is implicated, thus rendering *Wadle* the applicable framework. *See, e.g., Pittman v. State*, 234 N.E.3d 874, 887-88 (Ind. Ct. App. 2024) (analyzing the defendant's claim that his convictions for attempted robbery and felony murder constituted a double-jeopardy violation under the *Wadle* analysis), *trans. denied*.

[26] When a single criminal act violates multiple statutes with common elements courts "first look to the statutory language" for each charge. *Wadle*, 151 N.E.3d at 248. If the language of either statute clearly permits multiple punishments, either expressly or by unmistakable implication, there is no double jeopardy violation. *Id*. The next step is to determine whether one of the offenses is inherently or factually included in the other. *Id*. An offense is an inherently lesser-included offense if it "is established by the same material elements or less than all the material elements" required to establish the offense charged; the offense "consists of an attempt to commit the offense charged"; or the offense differs from the offense charged in that "there is a less serious risk of harm to the same person, property, or public interest, or a lesser culpability required to establish its commission." Ind. Code § 35-31.5-2-168.

[27] An offense is a factually lesser-included offense if all elements of the alleged lesser-included offense are covered by the allegations in the charging instrument for the greater offense. *Watts v. State*, 885 N.E.2d 1228, 1231 (Ind. 2008). If neither offense is an included offense of the other, there is no substantive double jeopardy violation and the inquiry ends. *Wadle*, 151 N.E.3d at 248. On the other hand, if one offense is a lesser-included offense, substantive double jeopardy is violated where "the defendant's actions were so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Id*. at 249.

[28] In this case, Bryant was charged with, and convicted of, felony murder for the death of Pollard during the commission of the robbery. However, he was also

charged with, and convicted of, robbery for taking property from Szamlewski. Both the murder and robbery statutes permit multiple punishments for multiple victims. *See Powell*, 151 N.E.3d at 266 (stating that "in crimes such as murder, manslaughter, battery and reckless homicide, the gravamen of the offense is causing the death or injury of another person, i.e., the result is part of the definition of the crime"); *see also Pittman*, 234 N.E.3d at 887 (finding that "if there are two separate victims there cannot be a double jeopardy problem as to the offense they might have in question"). In other words, the separate victims represent different offenses because conduct has been directed at each individual, and there "cannot be a double jeopardy problem as to the offenses they might have in common." *Woodcock*, 163 N.E.3d at 875.

[29] Here, Bryant's robbery conviction was not factually or inherently included in the felony-murder conviction because they involved different victims and, therefore, the State has charged a separate material element. *See id.* To be sure, the identity of the victim is a material element of the offense. *Leonard v. State*, 73 N.E.3d 155, 162 (Ind. 2017). As a result, Bryant's conviction for robbery against Szamlewski was not established by proof of the same or less than all the material elements required to establish the felony murder committed against Pollard. See I.C. § 35-31.5-2-168. Where, as here, "one of the material elements of both offenses is a victim, and a separate victim is alleged for each offense, it would seem by definition one offense cannot be either a factually or inherently included lesser offense of the other." *Woodcock*, 163 N.E.3d at 875 (citing I.C. 35-31.5-2-168(3) (defining "included offense" in pertinent part as an

offense that "differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person . . . is required to establish its commission"). As Bryant's offenses are not inherently or factually included, there is no substantive double-jeopardy violation and the inquiry ends. *Wadle*, 151 N.E.3d at 248. Put differently, because Bryant was convicted of committing different statutory offenses against different victims that resulted in the death of one victim, no violation of double-jeopardy occurred. *See id.* at 247-49.

## II. Unanimity Instruction

[30] Bryant claims that his conviction for the armed robbery of Szamlewski must be reversed because the trial court did not provide the jury with a specific unanimity instruction. Bryant maintains that even though he did not object to the absence of such an instruction, the trial court "fundamentally erred" because "there is no guarantee that the jury issued a unanimous guilty verdict" on that count. *Appellant's Brief* at 2, 21.

[31] As Bryant did not object or request a specific unanimity instruction, he acknowledges that the alleged error is waived on appeal unless he proves that fundamental error occurred. *Baker v. State,* 948 N.E.2d 1169, 1173-74 (Ind. 2011). The bar for establishing fundamental error is "extraordinar[ily]" high. *Hardley v. State*, 905 N.E.2d 399, 402 (Ind. 2009). The doctrine is meant to cure the "most egregious and blatant" trial errors, "not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to

preserve an error." *Baer v. State*, 942 N.E.2d 80, 99 (Ind. 2011). Even an error that is prejudicial or that implicates a constitutional right is not itself sufficient to constitute fundamental error. *Salahuddin v. State*, 492 N.E.2d 292, 296 (Ind. 1986). Rather, a fundamental error is such a gross error that it renders any possibility of a fair trial "impossible." *Jewell v. State*, 887 N.E.2d 939, 942 (Ind. 2008). In other words, fundamental errors are those events at trial that are so facially and grossly prejudicial that a trial court has a duty to correct them without an objection. *Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012).

[32] The State correctly observes that one of the well-established rules of criminal pleading is that there can be no joinder of separate and distinct offenses in one and the same count. *Baker,* 948 N.E.2d at 1175. That is, a single count of a charging information may include but a single offense. *Townsend v. State,* 632 N.E.2d 727, 730 (Ind. 1994). Indeed, a disjunctive instruction—one that permits a jury to find a defendant guilty of two or more underlying acts, either of which is in itself a separate offense—is fatally ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense. *Baker,* 948 N.E.2d at 1175. The State may, however, allege alternative "theories of culpability" when prosecuting a defendant for a single offense. *Id.* That is, the jury may be presented with "alternative ways to find the defendant guilty as to *one element." Id.* (Emphasis in original).

[33] In this case, the State did not allege that Bryant committed one act or charged one offense in the disjunctive so that the jury had to find that Bryant robbed

*either* Pollard *or* Szamlewski. Rather, the State charged Bryant with committing—and the jury was instructed on—two acts in two separate counts: taking property from Pollard and taking property from Szamlewski. Because the State alleged and proved two criminal offenses against two victims, a unanimity instruction was not required. *See id.* at 1177-78 (a specific unanimity instruction is not required when the State designates the specific act upon which it relies to prove a particular charge); *compare with Lainhart v. State*, 916 N.E.2d 924, 942-3 (Ind. Ct. App. 2009) (reversing the defendant's conviction for lack of unanimity because the State offered three potential victims at distinct periods in time under one charge of intimidation).

[34] Notwithstanding the above, Bryant asserts that the State charged the items stolen in the disjunctive and the State's evidence was insufficient to prove that Bryant stole Szamlewski's credit cards and personal property. Hence, he contends that the trial court committed fundamental error by failing to give the specific unanimity instruction.

[35] Due process does "not require jurors to agree on the means by which a crime was carried out, but it does require them to render a unanimous verdict as to which actual offense was perpetrated." *Lainhart*, 916 N.E.2d at 941. Here, the jury unanimously agreed that Bryant robbed both Pollard and Szamlewski. Shooting Pollard to access the vehicle and clothing was one act of robbery. Then, pulling Szamlewski from the vehicle and throwing her to the ground constituted the second robbery. The disjunctive language identified the products of the robbery, i.e., the items that were taken. The language of which

Bryant complains was merely that of the State presenting the jury with alternative ways to find Bryant guilty as to one element of the crime, i.e., the property taken, which it was permitted to do. *See Baker*, 948 N.E.2d at 1177-78. For these reasons, the trial court did not commit error—much less fundamental error—in not providing the jury with a specific unanimity instruction.

## III. Admission of Surveillance Video

[36]  Bryant argues that the trial court erred in admitting into evidence the video and photographs of Bryant and Thomas at the Subway on March 6. Although Bryant did not object to the admission of that evidence, he claims that fundamental error occurred because the State failed to establish the authenticity of video and the photos.

[37]  Bryant correctly acknowledges that because he did not object to the admission of the evidence at trial, the issue is waived unless he can establish fundamental error, i.e., an error that made a fair trial impossible. *Sasser v. State,* 945 N.E.2d 201, 203 (Ind. Ct. App. 2011), *trans. denied*. Here, the State sought to admit the exhibit containing the video and photos under the silent witness theory that "permits the admission of photographs as substantive evidence, rather than merely as demonstrative evidence, so long as the photographic evidence is also relevant." *Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015), *trans. denied.* The foundational requirements for the admission of evidence under the silent witness theory are more stringent than those required for demonstrative evidence. *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014). There must be "a

strong showing of authenticity and competency, including proof that the evidence was not altered." *McCallister v. State*, 91 N.E.3d 554, 561-62 (Ind. 2018). As for video recordings: "[W]hen automatic cameras are involved, there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and changing of custody of the film after its removal from the camera." *McHenry v. State*, 820 N.E.2d 124, 128 (Ind. 2005).

[38] In this case, the Subway owner and IMPD detective testified about the number of cameras at the restaurant and their placement. The Subway owner also testified that the cameras recorded digitally, that he was the only one who had access to the system, and that he was able to download video but was unable to change or alter videos on the system.

[39] The detective testified that the Subway had "a consumer grade digital recorder surveillance system." *Transcript Vol. IV* at 131. While the Subway owner testified that the date and time were accurate on the video, the detective noted that the time stamp was off by one hour, eighteen minutes and fifty-three seconds. He confirmed, however, that the system operated properly, and the date was correct.

[40] The detective further testified that he downloaded the video three days after the robbery and shooting, that he removed the video directly from the system by transferring the data to a thumb drive, and that he did not edit, alter, or change the video in any way. Both the Subway owner and the detective testified that

the exhibits containing the video and photographs were true and accurate versions of the video and photos obtained from the surveillance system on March 6, 2022. The Subway owner also confirmed that he was working at the restaurant that day and that he was behind the counter in the still photographs that were taken from the video. This testimony was more than sufficient to ensure the authenticity and competency of the State's exhibits. *See, e.g., McCallister*, 91 N.E.3d at 561-62 (holding that testimony from a hotel manager about the surveillance system's operation, accuracy of the time-and-date stamp, footage that showed the hotel lobby, and a police officer's testimony that he had obtained the surveillance video from the hotel within days of the murder, provided sufficient grounds for admission of the video).

[41] While Bryant takes issue with the Subway owner and the detective's conflicting testimony about the accuracy of the timestamp, such a discrepancy does not negate the video's authenticity. *See, e.g., Kirby v. State*, 217 N.E.3d 575, 588 (Ind. Ct. App. 2023) (finding that an inaccurate timestamp and the detective's lack of knowledge regarding how the recording system operated were not fatal deficiencies to the admission of the evidence), *trans. denied*. Given the strong showing of authenticity here, any inconsistency regarding the accuracy of the timestamp was a question for the jury to resolve that went only to the weight of the evidence. *See, e.g., Young v. State*, 198 N.E.3d 1172, 1176-77 (Ind. 2022) (finding that jury could reasonably resolve an issue of conflicting timestamps).

[42] In sum, the State provided sufficient assurance as to the accuracy of the video and photographs, and Bryant has failed to show that the trial court erred in

admitting the exhibit containing that evidence into evidence. Bryant's claim of fundamental error fails.

## IV. Sufficiency of the Evidence

[43] Bryant argues that the evidence was insufficient to support his convictions. Specifically, Bryant claims that the State "failed to establish beyond a reasonable doubt that he participated in the robberies." *Appellant's Brief* at 31.

[44] Our standard for reviewing challenges to the sufficiency of the evidence is well established, as we have made clear that it is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Konkle v. State*, 253 N.E.3d 1068, 1090 (Ind. 2025). A conviction is supported by sufficient evidence if there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* We review only the evidence most favorable to the verdict and the reasonable inferences therefrom and will reverse "only where it is shown that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* at 1090-91.

[45] Further, a conviction may be supported by circumstantial evidence alone, and that evidence need not overcome every reasonable hypothesis of innocence. *Albrecht v. State*, 185 N.E.3d 412, 421 (Ind. Ct. App. 2022), *trans. denied.* It is sufficient if an inference drawn from the circumstantial evidence reasonably

tends to support the conviction. *Peters v. State*, 959 N.E.2d 347, 355 (Ind. Ct. App. 2011).

[46] To convict Bryant of felony murder as alleged in Count I, the State was required to prove that he killed Pollard while committing or attempting to commit robbery "which is to take property from another person or in the presence of another person by using or threatening the use of force, or by putting another person in fear." *See* Ind. Code § 35-42-1-1(2). To convict Bryant of armed robbery, a Class 3 felony, as alleged in Count III, the State had to prove that Bryant "knowingly or intentionally took property, to wit: credit cards and/or clothing and/or a vehicle from Stephanie Szamlewski or in the presence of Stephanie Szamlewski, by using force or by threatening the use of force, while he and/or Thomas was armed with a firearm." *See* I.C. § 35-42-5-1(a)(1); *Appellant's Appendix Vol. II* at 42.

[47] Here, the evidence at trial established that Bryant and Thomas were in the Subway parking lot on March 6, 2022, sorting through the merchandise that the Couple was selling. Although the Couple left the Subway after Bryant and Thomas did not buy anything, Bryant called Pollard a few hours later, requesting that he return to the Subway. When the Couple arrived, Thomas directed them to follow him and Thomas to another location. At some point, Thomas and Bryant exchanged text messages with each other about robbing the Couple. Specifically, Thomas texted Bryant, "When we pull up I'm a bop [Pollard] and we gone." *Transcript Vol. IX* at 235. Thomas then enlisted Wynn to help them commit the robbery.

[48]     After Thomas and Bryant parked on the street in a residential neighborhood, Wynn arrived. Thomas and Bryant approached the Blazer and spoke with Pollard while Wynn watched Szamlewski. After pretending to purchase some items of clothing, Thomas or Bryant shot Pollard. Thomas then pointed a gun at Szamlewski, pulled her out of the Blazer, and threw her to the ground. Thomas and Bryant drove away in the Blazer with the Couple's merchandise, Szamlewski's purse, and other personal items that belonged to the Couple.

[49]     About thirty minutes after the incident, Bryant texted the mother of his children, admitting that he robbed someone. The cell phone and tower data placed Bryant and Thomas together throughout the day, and detectives traced Thomas's and Bryant's cell phones to the location where Pollard was shot. Szamlewski provided the police with descriptions of the men who robbed her, and those descriptions matched the images of Thomas and Bryant on the Subway video.

[50]     The morning after the incident, Thomas texted Bryant an article about Pollard's murder. During the search of the Blazer, Thomas's and Bryant's fingerprints were found on the vehicle. Some of Szamlewski's property was recovered during the search of Thomas's residence, and Thomas's girlfriend used Szamlewski's credit card to purchase several items. Additionally, the spent cartridges discovered in Thomas's backyard matched those that were found at the scene of the shooting, and Bryant sold the murder weapon about three weeks after the shooting. From this evidence, the jury could reasonably

conclude beyond a reasonable doubt that Bryant actively planned and participated in the robbery and shooting.

[51] To the extent that Bryant argues that his convictions must be set aside because the State failed to prove he knowingly took Szamlewski's credit cards because Thomas was the thief, there is no distinction between the responsibility of a principal and an accomplice. *Wise*, 719 N.E.2d at 1198. The State only had to prove that Bryant aided, induced, or caused Thomas to take Szamlewski's credit cards. I.C. § 35-41-2-4; *see also Hampton v. State*, 719 N.E.2d 803, 807 (Ind. 1999). Here, the evidence demonstrated that Bryant aided in the robbery of Szamlewski. He knew that Thomas was taking the Couple's property, and he assisted him in doing so.

[52] In sum, the totality of the evidence presented at trial and the reasonable inferences drawn therefrom sufficiently established Bryant's guilt as to both offenses.

[53] Judgment affirmed.

Pyle, J. and DeBoer, J., concur.

ATTORNEYS FOR APPELLANT

Talisha R. Griffin
Casey Farrington
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana